# WILKINSON v. UNITED STATES.

No. 37.   Argued November 17, 1960.—Decided February 27, 1961.

*Rowland Watts* argued the cause for petitioner. With him on the brief was *Nanette Dembitz.*

*Kevin T. Maroney* argued the cause for the United States. With him on the briefs were *Solicitor General Rankin, Assistant Attorney General Yeagley, Bruce J. Terris, Lee B. Anderson* and *George B. Searls.*

*David Scribner, Ben Margolis* and *William B. Murrish* filed a brief for the National Lawyers Guild, as *amicus curiae,* urging reversal.

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner was convicted for having unlawfully refused to answer a question pertinent to a matter under inquiry before a subcommittee of the House Committee on Un-American Activities at a hearing in Atlanta,

Georgia, on July 30, 1958.[1] His conviction was affirmed by the Court of Appeals, which held that our decision in *Barenblatt* v. *United States,* 360 U. S. 109, was "controlling." 272 F. 2d 783. We granted certiorari, 362 U. S. 926, to consider the petitioner's claim that the Court of Appeals had misconceived the meaning of the *Barenblatt* decision. For the reasons that follow, we are of the view that the Court of Appeals was correct, and that its judgment must be affirmed.

I.

The following circumstances were established by uncontroverted evidence at the petitioner's trial:

The Committee on Un-American Activities is a standing committee of the House of Representatives, elected at the commencement of each Congress.[2] The Committee, or any subcommittee thereof, is authorized to investigate "(i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation

---

[1] The applicable statute is 2 U. S. C. § 192. It provides: "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months." 2 U. S. C. § 192.

[2] Rule X of the Standing Rules of the House of Representatives, as amended by the Legislative Reorganization Act of 1946, c. 753, § 121, 60 Stat. 812, 822, 823.

thereto that would aid Congress in any necessary remedial legislation." [3]

In the spring of 1958 the Committee passed a resolution providing for a subcommittee hearing to be held in Atlanta, Georgia, "relating to the following subjects and having the legislative purposes indicated:

"1. The extent, character and objects of Communist colonization and infiltration in the textile and other basic industries located in the South, and Communist Party propaganda activities in the South, the legislative purpose being:

"(a) To obtain additional information for use by the Committee in its consideration of Section 16 of H. R. 9352, relating to the proposed amendment of Section 4 of the Communist Control Act of 1954, prescribing a penalty for knowingly and wilfully becoming or remaining a member of the Communist Party with knowledge of the purposes or objectives thereof; and

"(b) To obtain additional information, adding to the Committee's overall knowledge on the subject so that Congress may be kept informed and thus prepared to enact remedial legislation in the National Defense, and for internal security, when and if the exigencies of the situation require it.

"2. Entry and dissemination within the United States of foreign Communist Party propaganda, the legislative purpose being to determine the necessity for, and advisability of, amendments to the Foreign Agents Registration Act designed more effectively to counteract the Communist schemes and devices now used in avoiding the prohibitions of the Act.

---

[3] Rule XI of the Standing Rules (60 Stat. 823, 828). These Standing Rules were specifically adopted by the House, at the beginning of the 85th Congress in 1957 (H. Res. No. 5, 85th Cong., 1st Sess.).

"3. Any other matter within the jurisdiction of the Committee which it, or any subcommittee thereof, appointed to conduct this hearing, may designate."

The subcommittee which was appointed pursuant to this resolution convened in Atlanta on July 29, 1958. At the opening of the proceedings on that day, the Chairman of the Committee orally summarized the purposes of the hearings. The petitioner was present and heard the Chairman's statement.

The first witness to appear was Amando Penha, who testified that he had been a member of the Communist Party from 1950 to 1958, having joined the Party at the request of the Federal Bureau of Investigation. He stated that he had served as a member of the National Textile Commission of the Party, which, he said, was set up to control and supervise the infiltration and colonization of the textile industry, particularly in the South. He described the "colonizer" system, which, he said, involves sending hard-core Party members into plants in jobs where they have close contact with rank-and-file workers. Penha described in some detail his trips throughout the South in compliance with the instructions of the National Textile Commission, and identified a number of individuals as "colonizers." Another witness, a Deputy Collector of Customs, described the influx of Communist propaganda sent from abroad into the United States and particularly into the South. Several other witnesses were then interrogated, some as to their activities as alleged Communist colonizers, others as to their connection with certain allegedly Communist-controlled publications. A number of these witnesses declined to answer most of the questions put to them.

On the following day the first witness before the subcommittee was Carl Braden. Although interrogated at length he declined to answer questions relating to alleged

Communist activity.[4]   The next witness was the peti-
tioner.   After being sworn and stating his name he
declined to give his residence address, stating that, "As a
matter of conscience and personal responsibility, I refuse
to answer any questions of this committee."   When asked
his occupation, he made the same response.   He was then
asked the question which was to become the subject of
the present indictment and conviction: "Mr. Wilkinson,
are you now a member of the Communist Party?"   He
declined to answer the question, giving the same response
as before.

The Committee's Staff Director then addressed the peti-
tioner at length, in explanation "of the reasons, the perti-
nency, and the relevancy of that question and certain
other questions which I propose to propound to you." [5]

---

[4] See *Braden* v. *United States, post,* p. 431.

[5] "Now, sir, I should like to make an explanation to you of the
reasons, the pertinency, and the relevancy of that question and cer-
tain other questions which I propose to propound to you; and I do
so for the purpose of laying a foundation upon which I will then
request the chairman of this subcommittee to order and direct you to
answer those questions.

"The Committee on Un-American Activities has two major respon-
sibilities which it is undertaking to perform here in Atlanta.

"Responsibility number 1, is to maintain a continuing surveillance
over the administration and operation of a number of our internal
security laws.   In order to discharge that responsibility the Com-
mittee on Un-American Activities must undertake to keep abreast
of techniques of Communists' operations in the United States and
Communist activities in the United States.   In order to know about
Communist activities and Communist techniques, we have got to
know who the Communists are and what they are doing.

"Responsibility number 2, is to develop factual information which
will assist the Committee on Un-American Activities in appraising
legislative proposals before the committee.

"There are pending before the committee a number of legislative
proposals which undertake to more adequately cope with the Com-
munist Party and the Communist conspiratorial operations in the
United States.   H. R. 9937 is one of those.   Other proposals are

In response the petitioner stated "I am refusing to answer any questions of this committee." He was then directed by the Subcommittee Chairman to answer the question as to his Communist Party membership. This time he responded as follows:

"I challenge, in the most fundamental sense, the legality of the House Committee on Un-American

pending before the committee not in legislative form yet, but in the form of suggestions that there be an outright outlawry of the Communist Party; secondly, that there be registrations required of certain activities of Communists; third, that there be certain amendments to the Foreign Agents Registration Act because this Congress of the United States has found repeatedly that the Communist Party and Communists in the United States are only instrumentalities of a Kremlin-controlled world Communist apparatus. Similar proposals are pending before this committee.

"Now with reference to pertinency of this question to your own factual situation, may I say that it is the information of this committee that you now are a hard-core member of the Communist Party; that you were designated by the Communist Party for the purpose of creating and manipulating certain organizations, including the Emergency Civil Liberties Committee, the affiliate organizations of the Emergency Civil Liberties Committee, including a particular committee in California and a particular committee in Chicago, a committee—the name of which is along the line of the committee for cultural freedom, or something of that kind. I don't have the name before me at the instant.

"It is the information of the committee or the suggestion of the committee that in anticipation of the hearings here in Atlanta, Georgia, you were sent to this area by the Communist Party for the purpose of developing a hostile sentiment to this committee and to its work for the purpose of undertaking to bring pressure upon the United States Congress to preclude these particular hearings. Indeed it is the fact that you were not even subpenaed for these particular hearings until we learned that you were in town for that very purpose and that you were not subpenaed to appear before this committee until you had actually registered in the hotel here in Atlanta.

"Now, sir, if you will tell this committee whether or not, while you are under oath, you are now a Communist, we intend to pursue that area of inquiry and undertake to solicit from you information respect-

Activities. It is my opinion that this committee stands in direct violation by its mandate and by its practices of the first amendment to the United States Constitution. It is my belief that Congress had no authority to establish this committee in the first instance, nor to instruct it with the mandate which it has.

"I have the utmost respect for the broad powers which the Congress of the United States must have to carry on its investigations for legislative purposes. However, the United States Supreme Court has held that, broad as these powers may be, the Congress cannot investigate into an area where it cannot legislate, and this committee tends, by its mandate and by its practices, to investigate into precisely those areas of free speech, religion, peaceful association and assembly, and the press, wherein it cannot legislate and therefore it cannot investigate."

The hearing continued. The Staff Director read part of the record of an earlier hearing in California, where a witness had testified to knowing the petitioner as a Communist. The petitioner was then asked whether this testimony was true. He refused to answer this and several further questions addressed to him. There was introduced into the record a reproduction of the petitioner's

---

ing your activities as a Communist on behalf of the Communist Party, which is tied up directly with the Kremlin; your activities from the standpoint of propaganda; your activities from the standpoint of undertaking to destroy the Federal Bureau of Investigation and the Committee on Un-American Activities, because indeed this committee issued a report entitled 'Operation Abolition,' in which we told something, the information we then possessed, respecting the efforts of the Emergency Civil Liberties Committee, of which you are the guiding light, to destroy the F. B. I. and discredit the director of the F. B. I. and to undertake to hamstring the work of this Committee on Un-American Activities."

registration at an Atlanta hotel a week earlier, in which he had indicated that his business firm association was the "Emergency Civil Liberties Committee."

The subsequent indictment and conviction of the petitioner were based upon his refusal, in the foregoing context, to answer the single question "Are you now a member of the Communist Party?"

## II.

The judgment affirming the petitioner's conviction is attacked here from several different directions. It is contended that the subcommittee was without authority to interrogate him, because its purpose in doing so was to investigate public opposition to the Committee itself and to harass and expose him. It is argued that the petitioner was wrongly convicted because the question which he refused to answer was not pertinent to a question under inquiry by the subcommittee, so that a basic element of the statutory offense was lacking. It is said that in any event the pertinency of the question was not made clear to the petitioner at the time he was directed to answer it, so that he was denied due process. Finally, it is urged that the action of the subcommittee in subpoenaing and questioning him violated his rights under the First Amendment to the Constitution.

In considering these contentions the starting point must be to determine the subject matter of the subcommittee's inquiry. House Rule XI, which confers investigative authority upon the Committee and its subcommittees, is quoted above. Because of the breadth and generality of its language, Rule XI cannot be said to state with adequate precision the subject under inquiry by a subcommittee at any given hearing. This the Court had occasion to point out in *Watkins* v. *United States,* 354 U. S. 178. See also *Barenblatt* v. *United States,* 360 U. S. 109, 116–117. But, as the *Watkins* opinion recognized, Rule XI

is only one of several possible points of reference. The Court in that case said that "[t]he authorizing resolution, the remarks of the chairman or members of the committee, or even the nature of the proceedings themselves" might reveal the subject under inquiry. 354 U. S., at 209. Here, as in *Barenblatt,* other sources do supply the requisite concreteness.

The resolution authorizing the subcommittee hearing in Atlanta was explicit. It clearly set forth three concrete areas of investigation: Communist infiltration into basic industry in the South, Communist Party propaganda in the South, and foreign Communist Party propaganda in the United States.[6] The pattern of interrogation of the witnesses who appeared on the first day of the hearing confirms that the subcommittee was pursuing those three subjects of investigation. The Staff Director's statement to the petitioner explicitly referred to the second of the three subjects—Communist Party propaganda in the South. We think that the record thus clearly establishes that the subcommittee at the time of the petitioner's interrogation was pursuing at least two related and specific subjects of investigation: Communist infiltration into basic southern industry, and Communist Party propaganda activities in that area of the country.

If these, then, were the two subjects of the subcommittee's inquiry, the questions that must be answered in considering the petitioner's contentions are several. First, was the subcommittee's investigation of these subjects, through interrogation of the petitioner, authorized

---

[6] By contrast, the authorizing resolution that was before the Court in *Watkins* incorporated by reference the full breadth and generality of Rule XI itself. That resolution simply empowered the Committee Chairman to appoint subcommittees "for the purpose of performing any and all acts which the Committee as a whole is authorized to do." See 354 U. S., at 211, n. 50.

by Congress? Second, was the subcommittee pursuing a valid legislative purpose? Third, was the question asked the petitioner pertinent to the subject matter of the investigation? Fourth, was he contemporaneously apprised of the pertinency of the question? Fifth, did the subcommittee's interrogation violate his First Amendment rights of free association and free speech?

The question of basic congressional authorization was clearly decided in *Barenblatt* v. *United States, supra.* There we said, after reviewing the genesis and subsequent history of Rule XI, that "[I]t can hardly be seriously argued that the investigation of Communist activities generally, and the attendant use of compulsory process, was beyond the purview of the Committee's intended authority under Rule XI." 360 U. S., at 120–121. The subjects under inquiry here surely fall within "the investigation of Communist activities generally."

The petitioner argues, however, that the subcommittee was inspired to interrogate him by reason of his opposition to the existence of the Un-American Activities Committee itself, and that its purpose was unauthorized harassment and exposure. He points to the Chairman's opening statement which mentioned activity against the Committee, to the fact that he was subpoenaed to appear before the subcommittee soon after he arrived in Atlanta to stir up opposition to the Committee's activities, and to the statement of the Staff Director indicating the subcommittee's awareness of his efforts to develop a "hostile sentiment" to the Committee and to "bring pressure upon the United States Congress to preclude these particular hearings."

But, just as in *Barenblatt, supra,* we could find nothing in Rule XI to exclude the field of education from the Committee's compulsory authority, we can find nothing to indicate that it was the intent of Congress to immunize

from interrogation all those (and there are many) who are opposed to the existence of the Un-American Activities Committee.

Nor can we say on this record that the subcommittee was not pursuing a valid legislative purpose. The Committee resolution authorizing the Atlanta hearing, quoted above, expressly referred to two legislative proposals, an amendment to § 4 of the Communist Control Act of 1954 and amendments to the Foreign Agents Registration Act of 1938. A number of other sources also indicate the presence of a legislative purpose. The Chairman's statement at the opening of the hearings contained a lengthy discussion of legislation.[7] The Staff Director's statement to the petitioner also discussed legislation which the Committee had under consideration.[8] All these sources indicate the existence of a legislative purpose. And the determination that purposes of the kind referred to are unassailably valid was a cornerstone of our decision in *Barenblatt,*

---

[7] ". . . [T]he Committee on Un-American Activities is continuously in the process of accumulating factual information respecting Communists, the Communist Party, and Communist activities which will enable the committee and the Congress to appraise the administration and operation of the Smith Act, the Internal Security Act of 1950, the Communist Control Act of 1954, and numerous provisions of the Criminal Code relating to espionage, sabotage, and subversion. In addition, the committee has before it numerous proposals to strengthen our legislative weapons designed to protect the internal security of this Nation.

"In the course of the last few years, as a result of hearings and investigations, this committee has made over 80 separate recommendations for legislative action. Legislation has been passed by the Congress embracing 35 of the committee recommendations and 26 separate proposals are currently pending in the Congress on subjects covered by other committee recommendations. Moreover, in the course of the last few years numerous recommendations made by the committee for administrative action have been adopted by the executive agencies of the Government."

[8] See note 5, *supra.*

*supra:* "That Congress has wide power to legislate in the field of Communist activity in this Country, and to conduct appropriate investigations in aid thereof, is hardly debatable. The existence of such power has never been questioned by this Court, and it is sufficient to say, without particularization, that Congress has enacted or considered in this field a wide range of legislative measures, not a few of which have stemmed from recommendations of the very Committee whose actions have been drawn in question here. In the last analysis this power rests on the right of self-preservation. . . ." 360 U. S., at 127–128.

The petitioner's contention that, while the hearing generally may have been pursuant to a valid legislative purpose, the sole reason for interrogating him was to expose him to public censure because of his activities against the Committee is not persuasive. It is true that the Staff Director's statement reveals the subcommittee's awareness of the petitioner's opposition to the hearings and indicates that the petitioner was not summoned to appear until after he had arrived in Atlanta as the representative of a group carrying on a public campaign to abolish the House Committee. These circumstances, however, do not necessarily lead to the conclusion that the subcommittee's intent was personal persecution of the petitioner. As we have noted, a prime purpose of the hearings was to investigate Communist propaganda activities in the South. It therefore was entirely logical for the subcommittee to subpoena the petitioner after he had arrived at the site of the hearings, had registered as a member of a group which the subcommittee believed to be Communist dominated, and had conducted a public campaign against the subcommittee. The fact that the petitioner might not have been summoned to appear had he not come to Atlanta illustrates the very point, for in that event he might not have been thought to have been

connected with a subject under inquiry—Communist Party propaganda activities in that area of the country.

Moreover, it is not for us to speculate as to the motivations that may have prompted the decision of individual members of the subcommittee to summon the petitioner. As was said in *Watkins, supra,* "a solution to our problem is not to be found in testing the motives of committee members for this purpose. Such is not our function. Their motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." 354 U. S., at 200. See also *Barenblatt, supra,* 360 U. S., at 132.

It is to be emphasized that the petitioner was not summoned to appear as the result of an indiscriminate dragnet procedure, lacking in probable cause for belief that he possessed information which might be helpful to the subcommittee. As was made clear by the testimony of the Committee's Staff Director at the trial, the subcommittee had reason to believe at the time it summoned the petitioner that he was an active Communist leader engaged primarily in propaganda activities.[9] This is borne out

---

[9] The trial testimony on this score was as follows: "In essence the information of which the committee was possessed was that Mr. Wilkinson was a member of the communist party, that he had been identified by a creditable witness under oath before the committee a short time or within a year or so prior to the Atlanta hearings, identified as a Communist. It was also the information of the committee that Mr. Wilkinson had been designated by the Communist hierarchy in the nation to spearhead or to lead the infiltration into the South of a group known as the Emergency Civil Liberties Committee which itself had been cited by the Internal Security Subcommittee as a communist operation or a communist front. It was the information of the committee that Mr. Wilkinson's assignments, including setting up rallies and meetings over the country for the purpose of engendering sentiment against the Federal Bureau of Investigation, against the security program of the govern-

by the record of the subcommittee hearings, including the content of the Staff Director's statement to the petitioner and evidence that at a prior hearing the petitioner had been identified as a Communist Party member.

The petitioner's claim that the question he refused to answer was not pertinent to a subject under inquiry merits no extended discussion. Indeed, it is difficult to imagine a preliminary question more pertinent to the topics under investigation than whether petitioner was in fact a member of the Communist Party. As was said in *Barenblatt,* "petitioner refused to answer questions as to his own Communist Party affiliations, whose pertinency of course was clear beyond doubt." 360 U. S., at 125. The contention that the pertinency of the question was not made clear to the petitioner at the time he was directed to answer it is equally without foundation. After the Staff Director gave a detailed explanation of the question's pertinency, the petitioner said nothing to indicate that he entertained any doubt on this score.[10]

We come finally to the claim that the subcommittee's interrogation of the petitioner violated his rights under the First Amendment. The basic issues which this contention raises were thoroughly canvassed by us in *Baren-*

---

ment, and against the Committee on Un-American Activities and its activities. Mr. Wilkinson had in the course of the relatively recent past prior to his appearance in Atlanta been sent into Atlanta by the communist operation for the purpose of conducting communist activities in the South and more specifically in the Atlanta area. What I'm telling you now is only a general summary, you understand."

[10] Since both the pertinency of the question and the fact that its pertinency was brought home to the petitioner are so indisputably clear, we need not consider the Government's contention that the record does not show that the petitioner ever did or said anything that could be understood as an objection upon grounds of lack of pertinency. See *Watkins* v. *United States,* 354 U. S. 178, 214–215; *Barenblatt* v. *United States,* 360 U. S. 109, 124.

*blatt.* Substantially all that was said there is equally applicable here, and it would serve no purpose to enlarge this opinion with a paraphrased repetition of what was in that opinion thoughtfully considered and carefully expressed. See 360 U. S., at 125–134.

It is sought to differentiate this case upon the basis that "the activities in which petitioner was believed to be participating consisted of public criticism of the Committee and attempts to influence public opinion to petition Congress for redress—to abolish the Committee." But we cannot say that, simply because the petitioner at the moment may have been engaged in lawful conduct, his Communist activities in connection therewith could not be investigated. The subcommittee had reasonable ground to suppose that the petitioner was an active Communist Party member, and that as such he possessed information that would substantially aid it in its legislative investigation. As the *Barenblatt* opinion makes clear, it is the nature of the Communist activity involved, whether the momentary conduct is legitimate or illegitimate politically, that establishes the Government's overbalancing interest. "To suggest that because the Communist Party may also sponsor peaceable political reforms the constitutional issues before us should now be judged as if that Party were just an ordinary political party from the standpoint of national security, is to ask this Court to blind itself to world affairs which have determined the whole course of our national policy since the close of World War II. . . ." 360 U. S., at 128–129.

The subcommittee's legitimate legislative interest was not the activity in which the petitioner might have happened at the time to be engaged, but in the manipulation and infiltration of activities and organizations by persons advocating overthrow of the Government. "The strict requirements of a prosecution under the Smith Act . . .

are not the measure of the permissible scope of a congressional investigation into 'overthrow,' for of necessity the investigatory process must proceed step by step." 360 U. S., at 130.

We conclude that the First Amendment claims pressed here are indistinguishable from those considered in *Barenblatt,* and that upon the reasoning and the authority of that case they cannot prevail.

*Affirmed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

In July 1958 the House Un-American Activities Committee announced its intention to conduct a series of hearings in Atlanta, Georgia, ostensibly to obtain information in aid of the legislative function of the House of Representatives.[1] Petitioner, a long-time opponent of the Committee,[2] decided to go to Atlanta for the purpose of lending his support to those who were fighting against the hearings. He arrived in Atlanta and registered in a hotel there on July 23 as a representative of the Emergency

---

[1] In my dissenting opinion in *Barenblatt* v. *United States,* 360 U. S. 109, 153–166, I set out the evidence from the Committee's own reports which indicates the Committee's real purpose in conducting this kind of hearing.

[2] During the past several years, the petitioner appears to have been associated with at least three different organizations that had as their primary aim the abolition of the Un-American Activities Committee. In addition to his association with the Emergency Civil Liberties Committee, which is shown by this record, petitioner seems to have been associated with similar organizations in Los Angeles and Chicago. At least he was accused of such associations when he was called before a previous hearing of the Committee in 1956. See Hearings before the House Committee on Un-American Activities, 84th Cong., 2d Sess., at Los Angeles, California, December 5–8, 1956, entitled "Communist Political Subversion, Part I," pp. 6747–6753.

Civil Liberties Committee, a New York organization which was working for the abolition of the Un-American Activities Committee. Within an hour of his registration, petitioner was served with a subpoena requiring his appearance before the Committee. When he appeared in response to this subpoena, petitioner was told that he had been subpoenaed because the Committee was informed that "you were sent to this area by the Communist Party for the purpose of developing a hostile sentiment to this committee and to its work for the purpose of undertaking to bring pressure upon the United States Congress to preclude these particular hearings." [3] A number of questions were then put to petitioner, all of which related to his personal beliefs and associations, but petitioner refused to answer any of these questions on the ground that they violated his rights under the First Amendment. For this, he was convicted under 2 U. S. C. § 192 and sentenced to jail for 12 months.

On these facts, which are undisputed in the record, the majority upholds petitioner's conviction as "indistinguishable" from that upheld in *Barenblatt* v. *United States.*[4] On this point, I find myself only partially in disagreement with the majority. I think this case could and should be distinguished from *Barenblatt* on the ground urged by MR. JUSTICE DOUGLAS—that the resolution authorizing the Un-American Activities Committee does not authorize that Committee to interrogate a person for criticizing it. I therefore join in the dissent filed by MR. JUSTICE DOUGLAS on that ground. On the other hand, I must agree with the majority that so far as petitioner's constitutional claims are concerned, *Barenblatt* is "indistin-

---

[3] Significantly, the petitioner was never told, nor does the record disclose for our consideration here, either the source or the nature of the alleged information referred to.

[4] 360 U. S. 109.

guishable." Unlike the majority, however, I regard this recognition of the unlimited sweep of the decision in the *Barenblatt* case a compelling reason, not to reaffirm that case, but to overrule it.

In my view, the majority by its decision today places the stamp of constitutional approval upon a practice as clearly inconsistent with the Constitution, and indeed with every ideal of individual freedom for which this country has so long stood, as any that has ever come before this Court. For, like MR. JUSTICE DOUGLAS, I think it clear that this case involves nothing more nor less than an attempt by the Un-American Activities Committee to use the contempt power of the House of Representatives as a weapon against those who dare to criticize it. The majority does not and, in reason, could not deny this for the conclusion is all but inescapable for anyone who will take the time to read the record.[5] They say instead that it makes no difference whether the Committee was harassing petitioner solely by reason of his opposition to it or not because "it is not for us to speculate as to the motivations that may have prompted the decision of individual members of the subcommittee to summon the petitioner." The clear thrust of this sweeping abdication of judicial power is that the Committee may continue to harass its opponents with absolute impunity so long as the "protections" of *Barenblatt* are observed. Since this is to be the rule under which the Committee will be permitted to operate, I think it necessary in the interest of fairness to those who may in the future wish to exercise their constitutional right to criticize the Com-

---

[5] I agree with the majority that, in a sense, "[t]hese circumstances, however, do not *necessarily* lead to the conclusion that the subcommittee's intent was personal persecution of the petitioner" (emphasis supplied), but I am satisfied that the evidence, though not absolutely conclusive, is overwhelming.

mittee that the true nature of those "protections" be clearly set forth.

The first such "protection" relates to the question of whom the Committee may call before it. Is there any limitation upon the power of the Committee to subpoena and compel testimony from anyone who attacks it? On this point, the majority, relying upon the fact that at a previous hearing the Committee was told by a paid informant that petitioner was a Communist and upon statements by the Committee's counsel to the effect that the Committee had information that petitioner had been sent to Atlanta by the Communist Party, says simply: "It is to be emphasized that the petitioner was not summoned to appear as the result of an indiscriminate dragnet procedure, lacking in probable cause for belief that he possessed information which might be helpful to the subcommittee." Significantly, the majority does not say just how much its "emphasis" on this point is worth, if anything. Thus, for all that appears in the majority opinion, there is no assurance that the Committee will be required to produce any information at all as a prerequisite to the exercise of its subpoena and contempt powers. Assuming for the sake of argument, however, that such a requirement will be imposed, it then becomes relevant to inquire as to just how much this requirement will mean in terms of genuine protection for those who in good faith wish to criticize the Committee.

That inquiry is, to my mind, satisfactorily settled by a look at the facts of this case. So far as appears from this record, the only information the Committee had with regard to petitioner was the testimony of an informant at a previous Committee hearing. The only evidence to the effect that petitioner was in fact a member of the Communist Party that emerges from that testimony is a flat conclusory statement by the informant that it was

so.[6]  No testimony as to particular happenings upon
which such a conclusion could rationally be based was
given at that hearing.  When this fact is considered in
conjunction with the fact that petitioner was not accorded
the opportunity to cross-examine the informant [7] or the
protection of the statute permitting inspection of state-
ments given to the F. B. I. by informants,[8] it seems
obvious to me that such testimony is almost totally worth-
less for the purpose of establishing probable cause.  For
all we know, the informant may have had no basis at all
for her conclusion and, indeed, the possibility of perjury
cannot, in view of its frequent recurrence in these sorts of
cases,[9] be entirely discounted.  Thus, in my view, the "pro-
tection" afforded by a requirement of some sort of prob-
able cause, even if imposed, is almost totally worthless.
In the atmosphere existing in this country today, the
charge that someone is a Communist is so common that
hardly anyone active in public life escapes it.  Every
member of this Court has, on one occasion or another,

---

[6] The "evidence" relied upon by the Committee is contained in the
following colloquy between the informant, a Mrs. Schneider, and
the Committee counsel, a Mr. Arens:

"Mr. Arens. Was it [the Citizens Committee To Preserve American
Freedoms] Communist-controlled?

"Mrs. Schneider. Yes.

"Mr. Arens. Who was the ringleader in that organization?

"Mrs. Schneider. I didn't work in that organization, and I don't
know who the ringleader was.  My contact on that occasion was with
Frank Wilkinson, I believe.

"Mr. Arens. Did you know him as a Communist?

"Mrs. Schneider. Yes."  Hearings before the House Committee on
Un-American Activities, *op. cit., supra,* n. 2, at 6730.

[7] This, of course, is the established practice in hearings before the
House Committee on Un-American Activities.

[8] 18 U. S. C. § 3500.

[9] See, *e. g., Communist Party of the United States* v. *Subversive
Activities Control Board,* 351 U. S. 115; *Mesarosh* v. *United States,*
352 U. S. 1.

been so designated. And a vast majority of the members of the other two branches of Government have fared no better. If the mere fact that someone has been called a Communist is to be permitted to satisfy a requirement of probable cause, I think it plain that such a requirement is wholly without value. To impose it would only give apparent respectability to a practice which is inherently in conflict with our concepts of justice and due process.

The other such "protection" afforded to critics of the Un-American Activities Committee under these decisions is included in the majority's so-called balancing test. Under that test, we are told, this Court will permit only those abridgments of personal beliefs and associations by Committee inquiry that the Court believes so important in terms of the need of the Committee for information that such need outweighs the First Amendment rights of the witness and the public.[10] For my part, I need look no further than this very case to see how little protection this high-sounding slogan really affords. For in this case the majority is holding that the interest of the Committee in the information sought outweighs that of the witness and the public in free discussion while, at the same time, it disclaims any power to determine whether the Committee is in fact interested in the information at all. The truth of the matter is that the balancing test, at least as applied to date, means that the Committee may engage in *any* inquiry a majority of this Court happens to think could possibly be for a legitimate purpose whether that "purpose" be the true reason for the inquiry or not. And

---

[10] The test is stated by the majority in its opinion in *Barenblatt* in the following terms: "Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." 360 U. S., at 126. Cf. *American Communications Assn.* v. *Douds,* 339 U. S. 382; *Beauharnais* v. *Illinois,* 343 U. S. 250.

under the tests of legitimacy that are used in this area, any first-year law school student worth his salt could construct a rationalization to justify almost any question put to any witness at any time.

Thus, in my view, the conclusion is inescapable that the only real limitation upon the Committee's power to harass its opponents is the Committee's own self-restraint, a characteristic which probably has not been predominant in the Committee's work over the past few years. The result of all this is that from now on anyone who takes a public position contrary to that being urged by the House Un-American Activities Committee should realize that he runs the risk of being subpoenaed to appear at a hearing in some far off place, of being questioned with regard to every minute detail of his past life, of being asked to repeat all the gossip he may have heard about any of his friends and acquaintances, of being accused by the Committee of membership in the Communist Party, of being held up to the public as a subversive and a traitor, of being jailed for contempt if he refuses to cooperate with the Committee in its probe of his mind and associations, and of being branded by his neighbors, employer and erstwhile friends as a menace to society *regardless of the outcome of that hearing.* With such a powerful weapon in its hands, it seems quite likely that the Committee will weather all criticism, even though justifiable, that may be directed toward it. For there are not many people in our society who will have the courage to speak out against such a formidable opponent. But cf. *Uphaus* v. *Wyman,* 364 U. S. 388. If the present trend continues, this already small number will necessarily dwindle as their ranks are thinned by the jails. Government by consent will disappear to be replaced by government by intimidation because some people are afraid that this country cannot survive unless Congress has the power to set aside the freedoms of the First Amendment at will.

I can only reiterate my firm conviction that these people are tragically wrong. This country was not built by men who were afraid and it cannot be preserved by such men.[11] Our Constitution, in unequivocal terms, gives the right to each of us to say what we think without fear of the power of the Government. That principle has served us so well for so long that I cannot believe it necessary to allow any governmental group to reject it in order to preserve its own existence. Least of all do I believe that such a privilege should be accorded the House Un-American Activities Committee. For I believe that true Americanism is to be protected, not by committees that persecute unorthodox minorities, but by strict adherence to basic principles of freedom that are responsible for this Nation's greatness. Those principles are embodied for all who care to see in our Bill of Rights. They were put there for the specific purpose of preventing just the sort of governmental suppression of criticism that the majority upholds here. Their ineffectiveness to that end stems, not from any lack of precision in the statement of the principles, but from the refusal of the majority to apply those principles as precisely stated. For the principles of the First Amendment are stated in precise and mandatory terms and unless they are applied in those terms, the

---

[11] Mr. Justice Brandeis made this very point in his concurring opinion in *Whitney* v. *Califonia,* where he said: "Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty." 274 U. S. 357, 375. Mr. Justice Brandeis doubtless had in mind, and indeed made specific reference to, the famous words in Thomas Jefferson's first inaugural address: "If there be any among us who would wish to dissolve this union or change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it."

freedoms of religion, speech, press, assembly and petition will have no effective protection. Where these freedoms are left to depend upon a balance to be struck by this Court in each particular case, liberty cannot survive. For under such a rule, there are no constitutional rights that cannot be "balanced" away.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK concur, dissenting.

When petitioner was summoned before a subcommittee of the House Committee on Un-American Activities in Atlanta, Georgia, the Staff Director for the Committee made the following statement to him:

"It is the information of the committee or the suggestion of the committee that in anticipation of the hearings here in Atlanta, Georgia, you were sent to this area by the Communist Party for the purpose of developing a hostile sentiment to this committee and to its work for the purpose of undertaking to bring pressure upon the United States Congress to preclude these particular hearings. Indeed it is the fact that you were not even subpenaed for these particular hearings until we learned that you were in town for that very purpose and that you were not subpenaed to appear before this committee until you had actually registered in the hotel here in Atlanta.

"Now, sir, if you will tell this committee whether or not, while you are under oath, you are now a Communist, we intend to pursue that area of inquiry and undertake to solicit from you information respecting your activities as a Communist on behalf of the Communist Party, which is tied up directly with the Kremlin; your activities from the standpoint of propaganda; your activities from the standpoint of undertaking to destroy the Federal Bureau of Investigation and the Committee on Un-American Activ-

ities, because indeed this committee issued a report entitled 'Operation Abolition,' in which we told something, the information we then possessed, respecting the efforts of the Emergency Civil Liberties Committee, of which you are the guiding light, to destroy the F. B. I. and discredit the director of the F. B. I. and to undertake to hamstring the work of this Committee on Un-American Activities.

"So if you will answer that principal question, I intend to pursue the other questions with you to solicit information which would be of interest—which will be of vital necessity, indeed—to this committee in undertaking to develop legislation to protect the United States of America under whose flag you, sir, have protection.

"Now please answer the question: Are you now a member of the Communist Party?"

Petitioner answered, "I am refusing to answer any questions of this committee."

After a further explanation he was directed to answer. He replied:

"I have the utmost respect for the broad powers which the Congress of the United States must have to carry on its investigations for legislative purposes. However, the United States Supreme Court has held that, broad as these powers may be, the Congress cannot investigate into an area where it cannot legislate, and this committee tends, by its mandate and by its practices, to investigate into precisely those areas of free speech, religion, peaceful association and assembly, and the press, wherein it cannot legislate and therefore it cannot investigate." [1]

---

[1] The Washington Post on January 4, 1961, made a similar criticism of the House Committee on Un-American Activities:

"The Committee often functions as a kind of public pillory to punish men by publicity for offenses which the Constitution forbids

The Committee [2] is authorized by the Resolution governing it to make investigations of "the extent, character, and objects of un-American propaganda activities in the United States."

If it is "un-American" to criticize, impeach, and berate the Committee and to seek to have it abolished, then the Committee acted within the scope of its authority in asking the questions. But we take a dangerous leap when we reach the conclusion that criticism of the Committee was within the scope of the Resolution.

Criticism of government finds sanctuary in several portions of the First Amendment. It is part of the right

Congress to make punishable by law. It 'exposes' men who express opinions or indulge in associations of which the Committee disapproves, carelessly calling them—or allowing witnesses under the cloak of congressional immunity to call them—Communists or Communist-sympathizers or Communist dupes.

"The Committee, as a consequence of this conduct, sometimes operates as a serious restraint on freedom of expression and freedom of association. It makes Americans fearful of uttering opinions for which they may be called to account by the Committee and fearful of joining organizations which the Committee may consider subversive."

[2] The ultimate mandate of the parent Committee at the time of the subcommittee hearing was to be found in paragraph 17 (b), Rule XI, Rules of the House of Representatives, H. Res. 5, 85th Cong., 1st Sess., 60 Stat. 828. It provides: "The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." The record in this case also contains the mandate of the subcommittee (see note 5, *infra*), but the terms of the parent Committee's mandate are of course controlling. Of the purposes of the Committee, only the investigation of "un-American propaganda" activities seems even arguably to authorize the questions asked and the inquiry pursued in this case.

of free speech. It embraces freedom of the press. Can editors be summoned before the Committee and be made to account for their editorials denouncing the Committee, its tactics, its practices, its policies? If petitioner can be questioned concerning his opposition to the Committee, then I see no reason why editors are immune. The list of editors will be long as is evident from the editorial protests against the Committee's activities,[3] including its recent film, Operation Abolition.[4]

---

[3] See note 1, *supra*.

[4] The Washington Post said editorially on December 28, 1960:

"In his letters printed elsewhere in this newspaper today, Rep. Francis Walter asserts that the film *Operation Abolition* 'contains absolutely no distortions' and that the staff member who had admitted it contained such defects 'had not himself used the word "distortions." ' In a television show over KCOP–TV, Los Angeles, a teaching assistant at the University of California referred to distortions in the film. William Wheeler, an investigator for the House Un-American Activities Committee, taking part in the program asked, 'What are you trying to prove by this?' The following exchange then took place:

"Mr. White: That the film has inaccuracies and distortions.

"Mr. Wheeler: I've admitted that.

"Mr. White: You've admitted that?

"Mr. Wheeler: Certainly.

"Mr. Walter offers some carefully selected quotes from the San Francisco press to refute this newspaper's assertion that the San Francisco police 'reacted with altogether needless ferocity.' Like the film *Operation Abolition* itself, he omits all the material showing the other side of the picture. For instance, San Francisco *Chronicle* reporter George Draper wrote:

" 'I did not see any of the kids actually fighting with the police. Their resistance was more passive. They would simply go limp and be manhandled out of the building. . . . I saw one slightly built lad being carried by two husky officers. One held the boy's shirt, the other had him by the feet. He was struggling, but he was no match for the two bigger men. Then from nowhere appeared a third officer. He ran up to the slender boy firmly held by the other two officers and clubbed him three times on the head. You could hear the hollow smack of the club striking. The boy went limp and was carried out.'

The First Amendment rights involved here are more than freedom of speech and press. Bringing people together in peaceable assemblies is in the same category. *De Jonge* v. *Oregon,* 299 U. S. 353. "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *Id.,* at 364. The right to petition "for a redress of grievances" is also part of the First Amendment; it too is fundamental to "the very idea of a government, republican in form." *United States* v. *Cruikshank,* 92 U. S. 542, 552. Chief Justice Hughes, speaking for the Court in the *De Jonge* case involving communist activities no more nor less lawful than those charged here, said:

> "The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government

"Nor does Mr. Walter mention the report of another eyewitness, Mel Wax, a special correspondent of the New York *Post.*

" 'Never, in 20 years as a reporter, have I seen such brutality. . . . San Francisco police hurled women down the staircase, spines bumping on each marble stair.'

"To Mr. Walter, it is an admitted but 'decidedly minor' distortion in the film that Harry Bridges was represented as being on the scene just *before* the rioting broke out when, in point of fact, he did not arrive until after it was all over. 'Honest' this error may have been; but it was more than unfortunate. For it contributed considerably to the deceptive and distorted message of the film that the student demonstration was inspired and led by Communists.

"Communists may have tried to claim the credit which Mr. Walter accords them. Unquestionably the affair got out of hand, and no one condones the rowdiness that ensued. But the truth is that the demonstration was inspired by distaste for the Un-American Activities Committee. And it was led by students who intended nothing more than an orderly protest—an inalienable political right in the United States."

may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." *De Jonge* v. *Oregon, supra,* at 365.

These are reasons why I would construe the Resolution narrowly so as to exclude criticism of the Committee. We have customarily done just that, insisting that if "an inquiry of dubious limits" is to be found in an Act or Resolution, Congress should unequivocally authorize it. *United States* v. *Rumely,* 345 U. S. 41, 46; *United States* v. *Harriss,* 347 U. S. 612; *Watkins* v. *United States,* 354 U. S. 178, 198.

The indictment charged only the failure to answer the one question, "Are you now a member of the Communist Party?" That question in other contexts might well have been appropriate. We have here, however, an investigation whose central aim was finding out what criticism a citizen was making of the Government. That was the gist of the case presented to the jury.[5]

---

[5] At the trial committee counsel was cross-examined as follows:

"Q. Mr. Arens, you stated before the committee that Mr. Wilkinson had come to Atlanta to stir up hostility to the committee, that he was doing everything he could to prevent these hearings from being held in Atlanta?

"A. Yes, sir.

"Q. And that you did not subpoena him until you discovered that he had arrived here for that purpose?

"A. That's correct, sir.

"Q. Now, you state that within the three general categories under which the committee was holding hearings here of colonization in the textile industry, entry and dissemination of foreign propaganda and Communist party propaganda activity in the South, you are stating that Mr. Wilkinson stirring up hostility to the House Committee on Un-American Activities comes within the category of Communist party propaganda activity which justified the House Committee to subpoena him and question him, is that correct? I just want to understand your position.

"A. Yes, in general I agree with you, yes."

We cannot allow this man to go to prison for 12 months unless we hold that an investigation of those who criticize the Un-American Activities Committee was both authorized and constitutional. I cannot read the Resolution as authorizing that kind of investigation without assuming that the Congress intended to flout the First Amendment.

Mr. Justice Brennan, with whom Mr. Justice Douglas joins, dissenting.

For the reasons stated in my Brother Douglas' dissenting opinion in *Braden* v. *United States, post,* p. 446, which I joined, I believe that the Committee failed to lay an adequate foundation at the hearing for questions which, it was claimed, concerned the exercise of rights protected by the First Amendment.

I also dissent because on these facts the inference is inescapable that the dominant purpose of these questions was not to gather information in aid of law making or law evaluation but rather to harass the petitioner and expose him for the sake of exposure. A scant 19 months before the hearing in question petitioner was summoned before this very Committee and refused to answer questions on substantially the same grounds as those he claimed in this instance. Nor did his conduct in the interim afford any basis for a hope that he might have repented, an inference which, by contrast, was possible in *Flaxer* v. *United States,* 358 U. S. 147, 151, cited by the Government. For petitioner continued to proclaim his hostility to the Committee and his belief that it had no power to probe areas of free expression. He was not even called to testify at these hearings in Atlanta until the Committee learned that he was to be present in Atlanta to express his opposition to the Committee's work, as, of course, he had a right to do. In fact, the Committee's Staff Director came perilously close to admitting, on cross-examination by petitioner's counsel, that petitioner was called to the

stand only because of his opposition to the Committee's activities.

It is particularly important that congressional committees confine themselves to the function of gathering information when their investigation begins to touch the realm of speech and opinion. On this record, I cannot help concluding that the Committee had no reasonable prospect that petitioner would answer its questions, and accordingly that the Committee's purpose could not have been the legitimate one of fact gathering. I am forced to the view that the questions asked of petitioner were therefore not within the Committee's power. Cf. *Barenblatt* v. *United States,* 360 U. S. 109, 166 (dissenting opinion); *Uphaus* v. *Wyman,* 360 U. S. 72, 82 (dissenting opinion). I would reverse.