Frank GRUMMAN, Appellant

v.

UNITED STATES of America, Appellee.

No. 15747.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 2, 1960.

Decided June 30, 1961.

Petition for Rehearing Denied Aug. 1, 1961.

————◇————

Mr. David Rein, Washington, D. C., with whom Mr. Joseph Forer, Washington, D. C., was on the brief, for appellant.

Mr. William Hitz, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., at the time of argument, Carl W. Belcher, Asst. U. S. Atty., at the time of argument, and Miss Doris H. Spangenburg, Asst. U. S. Atty., were on the brief, for appellee.

Before Mr. Justice REED, retired,[*] BAZELON and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

Appellant was indicted, tried and convicted of the offense of contempt of Congress because of his refusal to answer a question put to him by a member of a subcommittee of the House Committee on Un-American Activities at hearings held in Washington, D. C., on July 18, 1957.

The Committee on Un-American Activities is a standing committee of the House of Representatives, elected at the commencement of each Congress.[1] The Committee, or any subcommittee thereof, is authorized to investigate "(i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and that attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." [2] In Watkins v. United States, 1957, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273, the Court said that to enable a congressional investigating committee to compel disclosures from an unwilling witness who objects to a question on grounds of pertinency, an explanation of pertinency is required. "But as the Watkins opinion recognized, Rule XI is only one of several possible points of reference. The Court in that case said that '[t]he authorizing resolution, the remarks of the chairman or members of the committee, or even the nature of the proceedings themselves' might reveal the subject under inquiry." Wilkinson v. United States, 1961, 365 U.S. 399, 81 S.Ct. 567, 572, 5 L.Ed.2d 633. Moreover, in Barenblatt v. United States, 1959, 360 U.S. 109, 79 S. Ct. 1081, 3 L.Ed.2d 1115, and Braden v. United States, 1961, 365 U.S. 431, 81 S.Ct. 584, 5 L.Ed.2d 592, as well as in Wilkinson (all subsequent to Watkins), the Supreme Court has made it abundantly clear that the authorization does enable the Committee to act and states further that persons can be convicted of contempt of Congress whenever the Committee's range of inquiry is narrowed to a specific subject matter sufficiently connected with a valid legislative purpose and whenever the witness is apprised of the subject matter of the inquiry and the pertinency of the particular question asked.

It is against this background that we turn to the case before us.

---

[*] Sitting by designation pursuant to Sec. 294(a), Title 28 U.S.Code.

[1.] Rule X of the Standing Rules of the House of Representatives, as amended by the Legislative Reorganization Act of 1946, c. 753, § 121, 60 Stat. 812, 822, 823.

[2.] Rule XI of the Standing Rules (60 Stat. 823, 828) which were specifically adopted by the House, at the beginning of the 85th Congress in 1957 (H.Res. No. 5, 85th Cong., 1st Sess.).

The hearings in question were opened on July 17, 1957, at which time the chairman of the subcommittee, Congressman Doyle, stated in pertinent part:

"The committee has long been interested in the situation which exists in the communications industry in the United States, namely, the position and influence held by members of the Communist Party and organizations dedicated to furthering the Communist objective."

He then read into the record a resolution adopted by the full committee on July 10, 1957, under which the subcommittee was then acting. That resolution authorized hearings

"for the purpose of considering whether or not members of the Communist Party or persons subject to its discipline are employed in various media of communications used in the transmission of vital communications, and the advisability, in the national defense and for internal security, of the adoption of remedial legislation authorizing the Defense Department and other Government agencies to adopt and enforce appropriate regulations designed to protect and preserve inviolate secret and classified Government information, and investing in appropriate Government agencies, power to preclude access to vital communication facilities in time of war or other national emergency, persons who probably will engage in, or probably will conspire with others to engage in, acts of espionage or sabotage."

Mr. Doyle then continued his own statement, in pertinent part, as follows:

"In these hearings * * * the committee hopes to ascertain the extent of the penetration and control exercised by members of the Communist Party over an industry which is vital to our defense; namely, communications. * * * It is the purpose of the subcommittee in the conduct of these hearings, to discharge the duties placed upon us by the Congress by calling witnesses who, we have reason to believe, possess information which will be of value to us and to the Congress in the consideration of such legislation."

The subcommittee then called one Michael Mignon, having satisfied itself in advance that Mignon would be a friendly witness. Mignon testified that he had been employed in the communications industry since before 1923; that in 1937 he was employed by American Communications Association (known at that time as American Radio Telegraphers Association); and that in 1938 he became vice president of that union, in charge of the radio and cable department. In 1940, he returned to work in the industry. He stated that he was a Communist Party member from 1936 to 1940 and that appellant was also a member. He further stated that appellant was and, in his belief, "still is" secretary-treasurer of Local 10, American Communications Association.

On the question of communist infiltration into the union and the industry, Mignon testified in part as follows:

"Mr. Scherer [Committee member]: I understand * * * your testimony * * * was to the effect that during the time you were a member of the Communist Party and a member of the American Communications Association, the Communists both in and out of the union desired to control the union, so that if a revolution should take place at some indefinite future time, or if we should be at war at some indefinite future time with the Soviet Union, then, and in that event, it might be possible either to commit espionage or sabotage more effectively if the party controlled the union. I understand that that was the substance of it.

"Mr. Mignon. I would place control before sabotage and espionage. * * * I would say control, and if unable to control, sabotage. * * *

\*  \*  \*  \*  \*  \*

"Mr. Scherer. * * * No actual steps had been taken toward planning how any sabotage might be committed, should these eventualities arise, namely, revolution or war with Russia.

"Mr. Mignon. That is right, sir."

The following day, the subcommittee called appellant as a witness. He stated that he had been employed by RCA Communications, Inc. as a radio operator for over twenty-five years and was currently on leave of absence to permit him to hold office as secretary-treasurer of Local 10, American Communications Association. He further stated that he had been president of Local 10, which had a total membership of approximately 1300. When the subcommittee began to question him about his alleged communist affiliation, appellant offered to read a typewritten document containing objections to the questioning. While the subcommittee did not permit appellant to read his prepared statement in its entirety, it did permit the statement to be filed and made a part of the record. That document reads in pertinent part as follows:

"I have conferred with counsel, in the light of the decisions of the United States Supreme Court in the Watkins and Sweezy cases. I am advised by counsel that the powers of this committee are strictly limited, especially when the committee seeks to compel a witness to testify 'about his beliefs, expressions, or associations.' Such questioning, said the Court, constitutes governmental interference with free speech, press, and assembly.

"The Court further pointed out that a committee may not call witnesses just to expose or punish them, but only for a necessary legislative purpose. So, said the Court, the protected freedoms of free speech and assembly 'should not be placed in danger in the absence of a clear determination by the House or the Senate that a particular inquiry is justified by a specific legislative need.'

" 'There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress. * * Investigations conducted solely for the personal aggrandizement of the investigators or to " 'punish' " those investigated are indefensible.'

\* \* \* \* \* \*

"The subcommittee asserts that it has been authorized by the committee to conduct this investigation. But that does not meet the test laid down by the Supreme Court—namely, that the House of Representatives make such an authorization. So far as I know, the House has never authorized this investigation either before or after House Resolution 5 was declared by the Supreme Court in the Watkins case to be unconstitutionally vague.

\* \* \* \* \* \*

"Finally, because there has been reference in these hearings to the possibility or potentiality of espionage or sabotage in this industry, I wish to make it clear that I have never heard of any worker, in any section of the industry, being engaged in or even charged with, let alone indicted or convicted on a charge of espionage or sabotage.

"And so, with all respect to this committee, acting on the advice of counsel, I shall decline to answer questions concerning my beliefs, expressions or associations on the ground that such questioning constitutes an interference with my rights under the first amendment to the Constitution and that such questioning is beyond the jurisdiction of the committee. The enabling resolution itself is an unlawful delegation of power to the committee. Moreover, I do not believe that any such questioning can be pertinent to any legitimate inquiry by the committee under its enabling resolution."

During the course of interrogating appellant, the following statements as to

subject matter under inquiry and pertinency were made:

"Mr. Arens [Committee counsel]. Now, Mr. Grumman, I want to advise you that this committee is considering legislation, considering the possibility of legislation which might implement the Communist Control Act of 1954 [50 U.S.C.A. §§ 782, 784, 785, 789, 790–793, 841–844].

"The Communist Control Act of 1954 precludes the certification by the National Labor Relations Board of an organization which is found by the Subversive Activities Control Board to be Communist infiltrated.

"The Committee is likewise considering whether or not these should be amendments to the Internal Security Act or the Communist Control Act or the creation of a new act for the purpose of precluding access to vital facilities by persons who are Communists who may engage in espionage or sabotage of vital communications facilities.

"I am not in this question undertaking to elicit from you anything of your beliefs, of your associations, or your expressions. This record at the present time shows that you, Frank Grumman, have been identified as a person known to have been a member of the Communist Party, you have told on this record that you are or have been employed as a radio operator in a vital communication facility.

\* \* \* \* \* \*

"Mr. Doyle. \* \* \* United States District Judge Youngdahl, in case of U. S. of America v. Seymour Peck [154 F.Supp. 603] \* \* \* said: 'For the Communist movement now constitutes a criminal conspiracy, and identifying members of the party may well be necessary under certain circumstances.' \* \* \* You testified that you are a mem-

ber of the very same organization which Mr. Mignon, the witness yesterday before this committee, under oath testified. \* \* \* On yesterday he testified that your union was dominated and controlled by the Communist Party, which Judge Youngdahl ruled within the last 15 days was now a criminal conspiracy.

"And here is what he said, as a member of the very union that you are a member of; \* \* \*. 'The eventual objective was when and if revolution came to change our form of government, that the Communists would be in a position to control communications facilities of the Nation.' I wish to say as subcommittee chairman, I think it is entirely pertinent and proper that we ask you whether or not you are a member of the Communist Party, for the purpose of this investigation.

"Mr. Arens. Now, Mr. Chairman, I wish to supplement even that statement, by one other statement. \* \*

"Namely, Mr. Grumman, if you are now a Communist, you could tell this committee, in all probability, of directives from the Communist Party to Communists respecting the vital communications facilities of this Nation. If you are now a Communist you could tell this committee of the techniques proposed by the Communist Party to seize the communications industry, to intercept messages, to sabotage communications in the event of war.

"Further, I think the record at this point might well, so it is abundantly clear, reflect the fact again that Mr. Mignon's identification of you as a Communist was some several years ago. Whether or not you are now a Communist does not appear in the record."

Mr. Doyle stated that the committee was acting under Public Law 601.[3] The statements to appellant as to pertinency and subject matter then continued.

---

**3.** 79th Cong., 2d Sess., 60 Stat. 812, 828 (1946).

"Mr. Arens. Now, Mr. Grumman, I say to you that the committee has not caused your appearance here today for the purpose of just exposing you, as such. We honestly feel that if you would testify you could tell this committee as did Mr. Mignon yesterday, about directives, policies, activities of the Communist Party, directed toward the communications industry, and that with that information this Committee on Un-American Activities would be enabled to formulate legislation to attempt to meet a situation in which a vital communications industry is potentially endangered by Communists.

\* \* \* \* \* \*

"Mr. Doyle. Now on yesterday, he, a former admitted Communist \* \* \* named you, Frank Grumman. \* \* \*

"Mr. Frazier [staff member]. As a member of the Communist Party.

"Mr. Doyle. As a member of the Communist Party when he was in the Communist Party, he said, with you, and in Local 10. He said that he sat in closed Communist cell meetings with you.

"Now I will ask you whether or not he was telling the truth or was he telling a falsehood?"

Appellant refused to answer the question,[4] and it was for that refusal that he was found guilty under Count Three of the indictment and convicted of the offense of contempt of Congress. Upon his refusal to answer on grounds of lack of pertinency, Mr. Doyle said:

"It is certainly pertinent. The testimony of Mr. Mignon and others has already shown before this committee that the union was at that time controlled by the principal officers, by identified Communists, in control of the policies of the union of which you are now a member, and secretary-treasurer, in the field of international cable communications, which is certainly an area involving the security of our Nation."

■ We note at this point that three counts of the indictment were dismissed at trial by agreement of counsel. The other questions which appellant refused to answer related to his present Communist Party membership and to whether he possessed information with respect to communists presently in the communications industry and in the American Communications Association. The question upon which the conviction was based was merely one of a series of preliminary inquiries whose pertinency is clearly established by Barenblatt, supra. We think it clear beyond dispute that, under that case, the committee here was acting pursuant to a valid legislative purpose. We think it also settled by that case that interrogation such as occurred here was authorized by Congress.

As in Wilkinson, appellant here was called before the committee on the basis of testimony that he was a member of the Communist Party. Also, as in Wilkinson and Barenblatt, "it is difficult to imagine a preliminary question more pertinent to the topics under investigation than whether petitioner was in fact a member of the Communist Party." Wilkinson, supra, 365 U.S. at page 413, 81 S.Ct. at page 575. We think that Wilkinson requires a balancing of appellant's First Amendment right to privacy as against the right of the Government to learn conditions necessary for a conclusion as to the need for legislation.

The importance of the communications industry in the event of enemy attack or in the event of internal disaster or civil disorder is too patent to require discussion. See e. g., Didriksen v. Federal Communications Commission, 1958, 103 U.S.App.D.C. 17, 254 F.2d 354.

■ Appellant also contends that his refusal to answer was not "wilfull" within the meaning of the statute because

---

4. Nowhere did appellant claim the privilege of the Fifth Amendment.

**714**

it was made in good faith and in reliance on Watkins, before the decision in Barenblatt. This contention likewise must fail. It is well settled that mistake of law is no defense to a prosecution for refusal to answer. Braden v. United States, supra; Sinclair v. United States, 1929, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692.

We have delayed decision in this case awaiting the decision of the Supreme Court in Deutch v. United States, 1961, 367 U.S. 456, 81 S.Ct. 1587. In that case, the Supreme Court reversed a contempt of Congress conviction because of lack of pertinency of the questions asked to the subject matter under inquiry. The holding seems to be that, even in the absence of a pertinency objection, the Government must prove pertinency to support a conviction for refusal to answer. However, the questions asked of Deutch related to purported Communist Party activities at Cornell University and were asked in the course of an investigation of such activities in the "Albany area," with particular emphasis on labor unions. The only connection established with Cornell was the practice of various Cornell students, including Communist Party members, of taking summer jobs involving union membership in the Albany area and, while so employed, of carrying on missionary work for the party. Thus the Supreme Court held, in effect, that the committee strayed from its announced subject under inquiry when it asked the disputed questions of Deutch.

No such situation is found here. The committee narrowed the subject under inquiry to the communications industry and to communist plans to take over or sabotage that vital industry. The questions asked of appellant were clearly pertinent to that inquiry.

We have examined the other contentions of appellant and find no error. The judgment of the District Court is

Affirmed.

BAZELON, Circuit Judge, concurs in the result.