UNITED STATES of America

v.

Seymour PECK.

Cr. No. 1214–56.

United States District Court
District of Columbia.

June 11, 1957.

See, also, 149 F.Supp. 238.

William Hitz, Asst. U. S. Atty., Washington, D. C., for plaintiff.

Telford Taylor, New York City, and Joseph Fanelli, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

The defendant, Seymour Peck, was convicted of "contempt of Congress"[1] on March 26, 1957. In view of the recent decision of the Supreme Court of the United States in Watkins v. United States,[2] he has moved for judgment of acquittal.[3]

Seymour Peck is a newspaperman employed by the "New York Times". By the use of compulsory process, the Internal Security Subcommittee of the United States Senate required Peck to appear as a witness before it. He freely answered all questions concerning his own activities, frankly admitted his past Communist affiliations, explained the reasons therefor, told the Subcommittee that he had fully terminated these affiliations in 1949, seven years prior to the date of his appearance before it, and added that in the seven years immediately preceding 1949 his associations with the Communist movement were virtually negligible.

---

1. 2 U.S.C. § 192.

2. 77 S.Ct. 1173.

3. Peck's appeal was pending at the time of the Watkins decision. Upon defendant's motion the United States Court of Appeals for the District of Columbia remanded the case to this Court "with leave to entertain a motion to dismiss the indictment or for a new trial". The defendant did not make either of these motions, but instead requested a judgment of acquittal. This Court does not construe the remand as limiting its authority to entertain motions to those specified in the Court of Appeal's order. It is obvious, for example, that if this Court granted a motion for a new trial, it could, upon completion of the government's case, entertain a motion for judgment of acquittal. In fact, for the reasons stated in this memorandum, if a new trial were ordered, the Court would grant such a motion. There seems to be no reason, therefore, why the Court may not do so at this point. The government and the defendant are in accord with this view, for at oral argument counsel

However, Peck refused to answer the questions which would have required him to identify others as Communists.

In the Watkins case, supra, the Supreme Court explicitly set forth the framework for judicial evaluation of prosecutions for contempt of Congress. The Court said, "In the decade following World War II, there appeared a new kind of congressional inquiry unknown in prior periods of American history. Principally this was the result of the various investigations into the threat of subversion of the United States Government, but other subjects of congressional interest also contributed to the changed scene. This new phase of legislative inquiry involved a broad-scale intrusion into the lives and affairs of private citizens. It brought before the courts novel questions of the appropriate limits of congressional inquiry. * * * The emphasis shifted to problems of accommodating the interest of the Government with the rights and privileges of individuals. The central theme was the application of the Bill of Rights as a restraint upon the assertion of governmental power in this form."[4] The Supreme Court forthrightly explained the reason for this shift in emphasis by setting forth the evils which result from abuses of the congressional power to investigate. The Supreme Court stated that these abuses not only invade the freedoms of the individual summoned as a witness, but that they adversely affect the general public as well by impeding freedom of thought and association.[5]

 This case exemplifies the abuses the Supreme Court sought to curtail. The Senate Internal Security Subcommittee conducted investigations which were indistinguishable in scope or nature from those the Supreme Court condemned. In addition, the particular series of hearings here involved constituted an even more serious threat to freedom of thought and expression. For these hearings consisted of the questioning of persons employed in the newspaper field, in radio and television. The danger inherent in such an investigation is found not only in the effect upon those investigated but also in the potential effect upon others in the same field.[6] There is no need to stress the importance to our society of a free press—and, therefore, of the necessity of enabling writers to formulate ideas and associations freely and without fear of governmental retribution by investigation or otherwise. History is replete with instances in which writers and philosophers have been penalized by the state, but it is always the writers and philosophers who are remembered and admired, never their prosecutors or inquisitors. It is difficult to draw the line between investigations of the political beliefs of newspapermen and investigations of newspapers. For newspapers consist of news stories and editorials; and news stories and editorials are written by newspapermen. To inhibit the freedom of thought and association of newspapermen is to infringe upon the freedom of the press. It is also a temptation to those investigating newspapermen to wander into the field of press content, and at times during these hearings the Subcommittee was unable to resist even this direct invasion. This Court said at the time of the trial that it had grave doubts as to the constitutionality of such a series of hearings, particularly under a resolution which does not contain specific authority therefor.[7] This Court added, however, that it felt that earlier opinions of the United States Court of Appeals for the District of Columbia had foreclosed that question.[8] At that time the Watkins case had been decided by the United

---

agreed that this Court has jurisdiction to grant the defendant's motion for acquittal.

4. Watkins v. United States, 77 S.Ct. 1173, 1183.

5. See also Sweezy v. New Hampshire, 77 S.Ct. 1203, decided the same day as Watkins.

6. Ibid.

7. See United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770.

8. E. g., Lawson v. United States, 85 U.S. App.D.C. 167, 176 F.2d 49, certiorari denied 339 U.S. 934, 70 S.Ct. 663, 94 L. Ed. 1352; Morford v. United States,

States Court of Appeals for the District of Columbia in the government's favor and the Supreme Court had not yet spoken. The Supreme Court's opinion, however, reopens this field to consideration as a result of the restoration of concern for individual liberties to its traditional high place in the judicial system, and the recognition of the practical effects of such investigations. Nevertheless, the instant case is not to be determined by the Subcommittee's violation of freedom of the press, for of even greater importance is the fact that Peck was deprived of the rights to which all witnesses, whatever their occupations, are entitled.

 The questions which Peck refused to answer infringed upon his basic First Amendment freedoms. Peck did not refuse to answer questions relating to espionage, sabotage, or the overthrow of the government by force and violence. In fact he informed the Subcommittee that he possessed no information whatever on those subjects and said that he would be willing to volunteer any such information to his government at any time—that he considered it his duty as a citizen to do so. The infringement stems from the Subcommittee's action in summoning an individual, compelling him to disclose his past political associations, and insisting that he reveal the views and associations of his friends and colleagues. In so doing, the Subcommittee invaded the individual's protected freedoms of privacy, thought, and association.[9] The effects of such an invasion upon the life of an individual, his family, and his friends, are often disastrous and the community as a whole is seriously harmed. Yet under certain circumstances the Congress may infringe upon an individual's First Amendment freedoms, but only when the national interest clearly justifies such drastic action,[10] and only when there is strict compliance with all procedural requirements.[11]

85 U.S.App.D.C. 172, 176 F.2d 54, reversed on other grounds 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815.

9. See Watkins v. United States, supra; but cf. Briehl v. Dulles, 248 F.2d 561, in which the United States Court of Appeals for the District of Columbia recently stated that the Communist movement shall not be "treated as any other political organization." The Court said that "in the present state of the world" adherence to the Communist cause cannot be considered "a mere matter of politics or political opinion." The Briehl case, however, does not attempt to deal with the question of the relation between First Amendment rights and adherence to the Communist movement prior to the time when the Congress declared it to be a "conspiracy" in 1950. In 1949 the Supreme Court said that adherence to the Communist party was not outside the protection of the First Amendment. In American Communications Ass'n C.I.O. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925, the Court held that requiring union officials to file non-communist affidavits constituted an infringement of First Amendment rights. In that case, although the Supreme Court held the infringement justifiable, it said, "By exerting pressures on unions to deny office to Communists and others identified therein, § 9(h) undoubtedly lessens the threat to interstate commerce, but it has the further necessary effect of discouraging the exercise of political rights protected by the First Amendment." The Court also said, "Communists, we may assume, carry on legitimate political activities. Beliefs are inviolate." American Communications Ass'n C.I.O. v. Douds, supra, 339 U.S. at page 393, 70 S. Ct. at page 681. Peck's Communist associations terminated in 1949. Therefore, to the extent that Briehl finds that the First Amendment does not apply to affiliations with the Communist party, the finding is inapplicable to this case. But Briehl is distinguishable on a more basic ground. For Briehl, unlike Peck and Watkins, was a passport applicant who was questioned by the State Department about his membership in the Party. The Court was thus not presented with the totality of First Amendment invasions which results from the summoning of a witness from comparative obscurity to face a public investigation into his prior associations and relationships.

10. American Communications Ass'n C.I.O. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137.

11. In Watkins, supra, the Court, commenting upon the earlier decision in Unit-

Watkins does not purport to determine the general question whether there is a sufficient national interest to justify requiring witnesses to identify others as Communists. But it does make clear the duty of courts to balance the necessity for obtaining such information from a particular witness against the invasion of individual rights which results from such questioning. In assessing the national interest, courts may look to several factors, including the degree of Communist activity of the witness; the remoteness of the period concerning which he is being questioned; the information already possessed by the committee concerning the particular activity to which the questioning relates; the sensitivity from a national security standpoint of the field of employment of the witness and of those he is being asked to identify. On the other side of the scale must be weighed the First Amendment. Courts must be zealous to guard against any unnecessary infringement of this right, for upon its strength rest the foundations of our form of government. Although an infringement of the Bill of Rights may be necessary under certain circumstances, no one can rejoice in such an exigency. For with each such authorized infringement, the rights of all citizens become fewer, the freedoms we cherish are limited, and democracy itself is weakened.

Peck was asked to identify persons who belonged to groups at a time when those groups constituted legitimate political associations and when many Americans who would have violently opposed the overthrow of the government by force were members. These questions related to periods which were remote in time and in which a different political climate prevailed. There had not yet occurred any armed conflict between American and Communist armies. The witness was asked to name his fellow members of the Young Communist unit at Hearns Department Store (in 1937-42) and the Communist party unit at a now defunct newspaper "The New York Star" (in late 1948 and early 1949).[12] There is little, if any, national interest to be served by engaging in so indiscriminate a resurrection of the political past—and whatever interest there is, is more than counterbalanced by the deprivation of First Amendment rights. So, too, with regard to the other questions Peck refused to answer. He declined to reveal whether he knew Mathilda Landsman to be a Communist either at the time he testified or when she worked as secretary to newspaper editors. The Subcommittee already had received information from a so-called "friendly" witness that Landsman was a "Communist". Thus Peck's confirmation, if in fact he could confirm this information, could be of little help to the Subcommittee in its efforts to identify "subversives". The Subcommittee already had all the information it needed to justify calling Landsman to question her about any "subversive activities". If upon questioning, Landsman denied the accusation, and the government considered prosecuting her for perjury, that would be time enough for the executive branch of the government to question her associates in order to determine its course of action. Nor was there any other valid national security interest great enough to justify the Subcommittee's requiring Peck to answer the question. The desire to check upon the reliability of a friendly witness is insufficient.

■ This is not to say that where there is a clear and legitimate need to identify persons as members of the Communist party, witnesses may not be com-

---

ed States v. Rumeley, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770, said, "It was concluded that, when First Amendment rights are threatened, the delegation of power to the committee must be clearly revealed in its charter." [77 S.Ct. 1184.]

12. Peck testified that he had attended only eight or ten meetings in the preceding seven years, and that his membership was nominal. He testified that the unit at the "Star" consisted of twelve to fourteen members; that it was quite inactive, and that it "exercised virtually no influence on the management or policy making of the paper." The Chairman of the Subcommittee expressed agreement with the latter statement.

pelled to reveal such information. For the Communist movement now constitutes a criminal conspiracy, and identifying members of the party may well be necessary under certain circumstances. Nevertheless, the existence of such a conspiracy at this time does not justify the subjecting to rigorous public examination by the legislature of the entire history of every individual who has at any time in the past had any connection with the Communist movement.

The balancing of the "Congressional need for particular information with the individual and personal interest in privacy is an arduous and delicate task for any court."[13] But it is a task which courts must perform. Failure to do so would be to "abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably encroach upon an individual's right to privacy nor abridge his liberty of speech, press, religion or assembly."[14]. In performing the judicial function, courts do not invade the legislative preserve. They do not tell the Congress what it may investigate or how it must proceed. They merely insist that individuals not be punished for actions which are not legally punishable.

But even if the interests of national security could be said to justify requiring Peck to answer the questions, the conviction could not stand. For the procedural defects inherent in the Subcommittee's investigations are such as to render unconstitutional any infringement of a witness' First Amendment rights.

■ The major defect in the investigations of the Internal Security Subcommittee is the vagueness of the resolution pursuant to which they were conducted. Although a pre-Watkins divided Court of Appeals decided that this resolution was sufficiently specific to meet the standards then deemed controlling as to authorizing resolutions,[15] it is abundantly clear that the resolution can no longer be said to avoid "the vice of vagueness".[16] In Watkins, the Supreme Court found that the authorizing resolution of the Un-American Activities Committee of the House of Representatives is of "confusing breadth" and that "its * * * boundaries are so nebulous"[17] that it is impossible for courts to determine when the Committee has exceeded its authority. The Court's conclusion was based on three factors: (1) the indefiniteness inherent in the term "un-American activities", (2) the wide "range of activity" of past Communist inquiries, and (3) the probe into the past "to collect minutiae".[18]

It seems unnecessary to explore in detail the nature of the authorizing resolution herein involved, the scope of the Subcommittee's previous investigations, or to belabor its propensity for equating the past with the present. It seems manifest that the vices to be found in the House Un-American Activities Committee's authorizing resolution are equally present in the charter of the Senate Internal Security Subcommittee. The Senate Resolution is composed of three sections, two of which relate to the study of internal security laws. The third section, however, purports to grant the authority to investigate "subversive activities".[19] The Supreme Court has clearly indicated that such a grant of authority

---

13. Watkins v. U. S., supra, 77 S.Ct. at page 1185.

14. Ibid., 77 S.Ct. at page 1185.

15. United States v. Lattimore, 94 U.S.App. D.C. 268, 215 F.2d 847.

16. Watkins v. United States, supra, 77 S. Ct. at page 1190.

17. Ibid., 77 S.Ct. at page 1188.

18. Ibid., 77 S.Ct. at page 1188.

19. "Resolved, that the Committee on the Judiciary, or any duly authorized subcommittee thereof, is authorized and directed to make a complete and continuing study and investigation of (1) the administration, operation, and enforcement of the Internal Security Act of 1950 [50 U.S.C.A. § 781 et seq.]; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United

must fail for want of definiteness. In Watkins the Court noted that the Chairman of the Un-American Activities Committee had announced that the scope of the investigation was "subversion and subversive propaganda". The Court then said, "This is a subject at least as broad and indefinite as the authorizing resolution of the Committee, if not more so."[20]

In its resolution, the Senate did not undertake the troublesome task of defining "subversive activities". The Senate did explicitly state, however, that the investigation was not limited to "movement(s) seeking to overthrow the Government of the United States by force and violence." But no indication is given as to what else is deemed "subversive", nor is the Court aware of a satisfactory definition. What may be a fit subject for investigation one day may be tomorrow's sacred cow. What is the height of orthodoxy today may be viewed as "un-American" tomorrow. Nor is there any individual who can be certain that he is not considered "subversive" by some of his fellow citizens. Who is to say, for example, whether one who is openly dedicated to depriving his neighbors of their 14th Amendment rights under the Federal Constitution is a "subversive"? The dangers of classifying certain forms of belief or political activity as "subversive" are all too apparent from the recent history of this country. It is too easy for one segment of public opinion to smear with that label those who hold opinions which are unpopular. Such labeling by means of legislative investigations constitutes a drastic form of Governmental sanction.[21] When that labeling is done in the manner utilized by the Senate Internal Security Subcommittee it becomes intolerable. Democracy deals with unpopular views by offering better ideas and programs, not by outlawing those views or penalizing their adherents.

The resolution cannot be saved by reference to the first two sections, which concern investigations of the Internal Security Act and laws relating to espionage and sabotage. Nor can it be saved by construing the third section to include only such "subversive activities" as are comprehended within the "including but not limited to" clause.[22] For the history of the Subcommittee's investigations[23] shows that it conceived its mission to be the broad task of rooting out "subversives" or Communists wherever it found them. The Subcommittee made no effort to distinguish among the several sections of its authorizing resolution in conducting its investigations, and thus the resolution must be evaluated as a whole. The Court must view it in the light of the Subcommittee's understanding of its mandate—to root out subversion. A comparison of the Subcommittee's reports with those of the Un-American Activities Committee demonstrates an identity of understanding as to the sweeping mission to be accomplished. Each conceived of itself as the nation's watchdog. Each thought that it was capable of determining what was "Un-American", what was "subversive". Each failed to distinguish between in-

---

States; and (3) the extent, nature, and effects of subversive activities in the United States, its Territories and possessions, including, but not limited to, espionage, sabotage, and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force and violence." (S.Res. 366.)

20. Ibid., 77 S.Ct. at page 1193.

21. Sweezy v. New Hampshire, supra.

22. "Espionage, sabotage and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force or violence."

23. See e. g. Annual Report for 1955 to accompany Sen.Res. 714 and Internal Security Annual Report for 1956. See also testimony of Senator James O. Eastland, Chairman of the Subcommittee, before the Court in this case.

nocent associations with groups which were legitimate at the time of membership and knowing adherence to a criminal conspiracy. Neither restricted its inquiries to acts of espionage, sabotage, or infiltration—whatever the latter means— by persons dedicated to overthrowing the government by force.[24] The Supreme Court has held that such a manifestation of authority renders an authorizing resolution, so questionable in its terms, vague or defective.

It is, therefore, the Court's conclusion that the Subcommittee unconstitutionally invaded Peck's rights. The witness' refusal to answer constituted a legitimate exercise of a basic right, secured to him and to every individual by the First Amendment to our Constitution. Such action is not punishable by any branch of the government. Accordingly, the defendant's motion for judgment of acquittal must be granted.

■■ There is an additional defect in the investigation which should be noted. The contempt of Congress statute makes it a misdemeanor for a witness to refuse to answer questions pertinent to the "question under inquiry". "Fundamental fairness" requires that the witness be able to determine at the hearing what the "question under inquiry" is.[25]

24. In Sweezy v. New Hampshire, supra, the Supreme Court reversed a state contempt conviction arising out of an investigation held under a statute authorizing investigations of violations of the New Hampshire Subversive Activities Act of 1951, RSA 588:1–588:16. Unlike the Senate, the New Hampshire legislature attempted to define a "subversive person", and did so partly in terms of membership in certain types of organizations. The Court was sharply critical of the failure of the legislature to distinguish between adherence to an organization with knowledge of its purpose to overthrow the government by force or violence and mere membership without knowledge of such purpose. The Court clearly indicated that in investigating "subversive persons" under so broad a statute, New Hampshire was stamping citizens with a "stain of disloyalty" and "inhibiting * * the flow of democratic expression". [77 S.Ct. 1210.] The Senate Internal Security Subcommittee's resolution and investigation suffer from a similar defect.

Furthermore, even the "including but not limited to" clause, standing alone, would present a serious problem for another reason. The clause speaks of "infiltration". But it does not indicate any object of "infiltration". Espionage and sabotage constitute acts in themselves. But one cannot "infiltrate" in a vacuum. One must infiltrate something. It might once have been said that "infiltration" referred to the obtaining of government jobs, or posts otherwise sensitive from a national security standpoint. Or infiltration might have been held to mean the stealthy, deceptive obtaining of a position with the intent to utilize it for some ulterior purpose, contrary to the policies of one's employer or of the national interest. Such has not been the interpretation of the Subcommittee, which has considered "infiltration" to mean the holding of any job by any "subversive". That interpretation by the Subcommittee necessitates a different judicial approach to the clause than would be possible if "infiltration" like "sabotage" or "espionage" referred to acts designed to affect the national interest adversely.

25. Even at the trial, the Court had considerable difficulty in determining the nature of the subject under inquiry. Relying on the subsequently reversed Watkins v. United States, 98 U.S.App.D.C. 190, 233 F.2d 681, and subsequently remanded Barenblatt v. United States, D.C. Cir., 240 F.2d 875, decisions of the United States Court of Appeals for the District of Columbia, this Court concluded that the question under inquiry was "Communist infiltration into mass communications." In so doing, the Court rejected the government's contention that the question under inquiry was "the full Committee powers" or the entire scope of the authorizing resolution. The Supreme Court Watkins decision would clearly require a reversal of Peck's conviction, had the Court found the subject under inquiry to be as broad and as vague as that which the government urged. But Watkins also would require reconsideration of the Court's findings as to the question under inquiry. For the Supreme Court in that case was unable to determine the question under inquiry, although the Court of Appeals had experienced no difficulty with this problem either in Watkins or in Barenblatt. Viewing the problem, post-Watkins and in line with the method of

During the hearing, in partial explanation of his refusal to answer a question, Peck stated, "The subpoena does not describe the subject matter under inquiry. I assume, however, that I am being called in the course of the hearings which your subcommittee is presently conducting, during which numerous individuals who are or have been connected with newspapers are questioned with respect to their associations, activities, and beliefs." Were the subject under inquiry what the witness stated it to be, the compelling of answers to questions would clearly have been in violation of his constitutional rights, for no committee could assume so unlimited and undemocratic a function. The Chairman of the Subcommittee, however, failed to correct the witness or to offer an explanation of the question under inquiry, but instead overruled his objection and ordered him to answer the question.

That the question under inquiry was not "luminous" [26] to the witness is the result of the precise defects in the method of exercising legislative authority which were involved in Watkins. In this case, too, "there is a wide gulf between the responsibility for the use of investigative power and the actual exercise of that power."[27] In this case, too, the Subcommittee ranged over many subjects during the course of its investigations, did not clearly establish any lines of demarcation between series of investigations, and did not restrict its questioning of the witnesses to any one field. The witness could not be aware of the subject under inquiry because there was no subject, except for the broad, vague, general authority of the Subcommittee.[28]

 The government contends, however, that even though a Committee is acting under a resolution which does not sufficiently define its authority, and even though a witness cannot determine the subject under inquiry, he has been afforded due process of law unless he objects to the questions asked on the specific grounds of "pertinency". This Court does not so narrowly construe Watkins, nor does it consider that such a construction is in any way consistent with the spirit of that ruling. Rather the Court believes that Watkins requires strict compliance by the Congress with procedural requirements of definiteness of authority and subject matter whenever First Amendment rights of a witness are involved.

 In any event, the Court finds that Peck did object to the lack of pertinency of the questions. Although he did not use the word "pertinency", he informed the Subcommittee that he did not believe that it possessed the authority to ask the particular questions involved. In so doing he also specifically put the Subcommittee on notice that his complaint related to the invasion of his First Amendment rights. Justification for such an invasion may be found only in cases in which the Subcommittee's authority is clearly defined, a clear question under inquiry is established and a question pertinent thereto is asked. Yet the Subcommittee made no effort to explain its asserted right to engage in such an invasion. Surely Peck's objection was sufficient, for where constitutional rights are involved, courts must liberally interpret objections of witnesses.[29] They cannot impose a standard of technicality or insist upon a rigid verbal formula which serves only to defeat the basic constitutional liberties they should strive to preserve.

determination utilized therein, this Court could not find that the government carried its burden of establishing the subject under inquiry at the time of the trial. Regardless of all else, the government's case would fail at this point, for without a subject it cannot establish the pertinency of the questions.

26. Concurring opinion of Justice Frank-

furter in Watkins v. United States, supra, 77 S.Ct. at page 1194.

27. Watkins v. United States, supra, 77 S.Ct. at page 1188.

28. See footnote 24, supra.

29. See Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964.