UNITED STATES of America

v.

Frank GRUMMAN.

Cr. No. 822–62.

UNITED STATES of America

v.

Bernard SILBER.

Cr. No. 823–62.

United States District Court
District of Columbia Division.

March 6, 1964.

3. Fairchild v. Hughes, 258 U.S. 126, 42 S.Ct. 274, 66 L.Ed. 499.

4. Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078.

5. 31 U.S.C.A. § 462.

David C. Acheson, U. S. Atty., William Hitz, Asst. U. S. Atty., for plaintiff.

David Rein, Washington, D. C., for defendant Grumman.

Victor Rabinowitz, New York City, David Rein, Washington, D. C., for defendant Silber.

YOUNGDAHL, District Judge.

These defendants have been tried in companion cases by the Court sitting without a jury, by the agreement of all parties. Both defendants have been indicted for contempt of Congress, 2 U.S.C. § 192, in refusing to answer certain questions propounded to them as witnesses during public hearings of a subcommittee of the House Un-American Activities Committee in 1957. The present indictments were returned after convictions based upon previous indictments for the same offense were reversed *per curiam* by the Supreme Court as to defendant Grumman, 370 U.S. 288, 82 S.Ct. 1560, 8 L.Ed.2d 501 (1962), and as to defendant Silber, 370 U.S. 717, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962). Both reversals rested upon the authority of Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), decided only a few weeks previously, which had held that an indictment for contempt of Congress must specify the subject under Congressional subcommittee inquiry at the time the witness was interrogated. In these new indictments, the subject under inquiry is alleged to have been:

"considering whether or not members of the Communist Party or persons subject to its discipline are employed in various media of communications used in the transmission of vital communications, and the advisability, in the national defense and for internal security, of the adoption of remedial legislation authorizing the Defense Department and other Government agencies to adopt and enforce appropriate regulations designed to protect and preserve inviolate secret and classified Government information, and investing in appropriate Government agencies, power to preclude access to vital communication facilities in time of war or other national emergency, persons who probably will engage in, or probably will conspire with others to engage in, acts of espionage or sabotage * * *."

Neither defendant disputes that the above was the subject under inquiry at the time he was interrogated, although they do dispute the authority of the subcommittee to inquire into this subject. Both, moreover, advance other grounds for a judgment of acquittal—grounds which were not considered by the Court of Appeals when it affirmed the convictions (based upon the earlier, defective indictments) of Grumman, 111 U.S.App.D.C. 79, 294 F.2d 708 (1961), and of Silber, 111 U.S.App.D.C. 331, 296 F.2d 588 (1961).[1] Because of a case de-

---

1. Neither Silber nor Grumman relied upon the self-incrimination clause of the Fifth Amendment in refusing to answer the questions upon which the past and present indictments were based. In the present indictment, Silber is charged with contempt of Congress in failing to answer the following three questions:

 Count One: "Was he [the person who recruited defendant in the Communist Party] a communications worker?"

 Count Two: "Were any of the officers of your union members of the Communist Party at the time you were a member of the Communist Party?"

 Count Three: "Were any of the present officers of your union members of the Communist Party at the time you were in the Party?"

 In the present indictment, Grumman is charged with contempt of Congress in failing to answer one question:

 "As a member of the Communist Party when he [Mignon] was in the Communist Party, he said, with you, and in Local 10. He said that he sat in closed

cided by the Supreme Court on June 17, 1963, Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963) and for other reasons which the Court finds compelling, this Court has concluded that findings of not guilty must be made in both cases. Each case will be discussed separately.

### The Silber Case.

In Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963), the Supreme Court reversed a contempt of Congress conviction because the House Un-American Activities Committee had failed to comply with its own rules regarding the choice between executive and public sessions. Rule IV of the Committee's own Rules provided, at the time Yellin was questioned (and at the time both defendants Silber and Grumman were questioned):

"IV—EXECUTIVE AND PUBLIC
HEARINGS:

"A—*Executive:*

"(1) If a majority of the Committee or subcommitee, duly appointed as provided by the rules of the House of Representatives, believes that the interrogation of a witness in a public hearing might endanger national security or unjustly injure his reputation, or the reputation of other individuals, the Committee shall interrogate such witness in an Executive Session for the purpose of determining the necessity or advisability of conducting such interrogation thereafter in a public hearing.

\* \* \* \* \* \*

"(3) All testimony taken in Executive Sessions shall be kept secret and shall not be released or used in public sessions without the approval of a majority of the Committee.

Communist cell meetings with you. Now I will ask you whether or not he was telling the truth or was he telling a falsehood?"

Silber's previous indictment contained one additional count, 111 U.S.App.D.C. at

"B—*Public Hearings:*

"(1) All other hearings shall be public."

The Supreme Court held in the Yellin case that this rule had been violated in two respects:

"First, it does not appear from Congressman Walter's [the Committee Chairman] testimony that the Committee considered injury to the witness' reputation when it decided against calling Yellin in executive session. \* \* \* By Congressman Walter's own admission, the Committee holds executive sessions in only two of the three instances specified in Rule IV, i. e., when there may be injury to the reputation of a third party or injury to the national security. Injury to the witness himself is not a factor. \* \* \*

"Secondly, the Committee failed to act upon petitioner's express request for an executive session. A Staff Director, who lacked the authority to do so, acted in the Committee's stead." 374 U.S. at 118–119, 83 S.Ct. at 1834–1835, 10 L.Ed.2d 778.

The Court concluded that Rule IV was designed for the protection of witnesses, 374 U.S. at 115–116, 83 S.Ct. at 1832–1833, 10 L.Ed.2d 778, that it entitled the witness to the exercise of the Committee's discretion in accord with Rule IV's standards, 374 U.S. at 120, 83 S.Ct. at 1835, 10 L.Ed.2d 778, and that failure on the part of the Committee to adhere to its own rules requires the reversal of any subsequent conviction for contempt of Congress, even if the witness did not invoke Rule IV at the time he refused to answer the question propounded, 374 U.S. at 123, 83 S.Ct. at 1836–1837, 10 L.Ed.2d 778. "The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too

332, 296 F.2d 589. Grumman's previous indictment contained three additional counts, 111 U.S.App.D.C. 84, 294 F.2d 713.

exacting to require that the Committee be equally meticulous in obeying its own rules." 374 U.S. at 124, 83 S.Ct. at 1837, 10 L.Ed.2d 778.

Under the clear authority of Yellin, a judgment of acquittal must be entered so far as defendant Silber is concerned. Silber, like Yellin, after receiving a subpoena to appear before the subcommittee of the House Un-American Activities Committee, requested an executive session in a telegram sent (and received) prior to his appearance before the subcommittee. Silber's request, like Yellin's was denied by the Staff Director without consultation either with the Committee or with the subcommittee or with the chairman of either. Silber, like Yellin, was thereafter required to appear for interrogation at a public session.

The telegram requesting an executive session was sent by Victor Rabinowitz (an attorney who appeared with Silber at the public hearing and who has represented Silber in all subsequent proceedings growing out of Silber's refusal to answer certain questions, including the instant trial) in behalf of four subpoenaed witnesses, including Silber. The existence of this telegram was first revealed on August 2, 1957, at the beginning of the questioning of Louis J. Stallone, one of the four witnesses in whose behalf it was sent. Silber appeared for interrogation later the same morning. The following exchange between Mr. Rabinowitz, Congressman Clyde Doyle (chairman of the subcommittee, now deceased), and Richard Arens (Staff Director) demonstrates that neither the subcommittee nor the subcommittee chairman had known of the existence of the telegram before the request for an executive session had been turned down and the witnesses had appeared for public interrogation:

"Mr. Rabinowitz: I wonder, Mr. Chairman, whether I might not at this time introduce into the record with the consent of Mr. Arens a telegram I sent to him yesterday which I would like to read, if I may. It is addressed to—

"Mr. Doyle: On what subject?

"Mr. Rabinowitz: On the subject of these hearings.

"Mr. Arens: Is that the telegram, Mr. Rabinowitz, in which you requested that the hearings be taken in executive session?

"Mr. Rabinowitz: Yes.

"Mr. Arens: Mr. Chairman, Mr. Rabinowitz has made a request that the hearings be taken in executive session and pursuant to the policy of the committee as announced, and the direction from the chairman, I advised Mr. Rabinowitz that the request would be denied.

"Mr. Rabinowitz: May I read the telegram just so that as a matter of record it appears before the committee. I don't know whether the subcommittee even knew about the telegram, and I think it ought to pass on the request, rather than counsel.

"Mr. Doyle: No.

"Mr. Rabinowitz: It is a short telegram. I could have finished it by this time.

"Mr. Doyle: No, counsel. You see, our director acts on these formal requests in a matter of established policy by the committee. It is not a matter that has to be presented to the subcommittee.

"Mr. Rabinowitz: I don't want to argue it.

"Mr. Doyle: I know. But there is no need in encumbering the record with a telegram that is not pertinent to the hearing.

"Mr. Rabinowitz: Except the court may consider it pertinent. Many things considered by these—

"Mr. Doyle: Counsel, please. I called attention in my opening statement that your exclusive function is to advise your client. It is not a legal forum; it is an investigating committee.

"Mr. Rabinowitz: Well, if you—

"Mr. Doyle: I cannot see how in the world any rights of your client are jeopardized by our refusal to accede to your request for an executive hearing.

"Mr. Rabinowitz: Very well. If the chairman is satisfied to have counsel make rulings for the committee, I will desist.

"Mr. Doyle: The counsel made that ruling in accordance with our established policy and when he made that ruling he was acting within his province." "Investigation of Communist Penetration of Communications Facilities—Part I," Hearings Before the Committee on Un-American Activities of the House of Representatives, 85th Cong., 1st Sess. 1470-1 (1957).

Thus neither Congressman Doyle nor the subcommittee passed on the request for executive session, but rested instead upon the policy of "the committee," meaning the parent body, the entire House Un-American Activities Committee. When Mr. Arens spoke of "the direction from the chairman," he was referring to Congressman Francis E. Walter, chairman of the parent body and, like Doyle, now deceased.

When Mr. Arens first was asked whether he had consulted Congressman Walter after receipt of the telegram requesting an executive session and before sending a telegram refusing such request, he said that he did not remember. (S-Tr. 43.)

The next day, however, he testified as follows:

"Upon receipt of a telegram from Mr. Rabinowitz, in which he solicited an executive session, I communicated immediately or very promptly with the Chairman because we were then, I remember, in hearings

or in the hearing stage. * * * [I] went to see him, and I don't know whether I actually displayed the telegram to him or not, [or] told him about it. * * * He said he wanted to consult with the chairman of the subcommittee, who was Congressman Doyle * * *. But he [Walter] then subsequently, and I can't tell you whether it was the same hour, the same day, or when it was, I mean, as of when it was, but it was within a day or so, within a half a day, told me to send a message back that the executive session was declined." (S-Tr. 57-8.)

A week later, after this trial had been concluded and after further reflection, Mr. Arens informed the Court, through a letter to the Assistant United States Attorney,[2] that the testimony just quoted "is too specific; is not supported by my independent recollection; and, I have since determined, is in contradiction of other occurrences which are factually unassailable." Mr. Arens went on to conclude that he discussed the specific telegram with Congressman Walter only *after* the hearings had been concluded, when possible contempt citations were under consideration; and that when he referred in the hearings to "the direction from the chairman," he meant only a general direction applying to all witnesses before the hearings had begun, not a specific direction in response to the specific request made on behalf of Silber.

Mr. Arens had described at the trial what he meant by this more general direction. He testified that before the public hearings, an executive session of the entire Committee was held, at which it was decided, among other matters, that the hearings into alleged Communist penetration of the communications industry would be public. (S-Tr. 48.)[3]

2. Mr. Arens brought this additional information to the Court, he said, in "the interests of justice and fair play," and it was received without objection in the

presence of both the Assistant U. S. Attorney and counsel for both defendants.

3. The date of this executive session is not entirely clear. In the testimony, the date

He also testified that Congressman Walter

"would be in frequent consultation with the chairman of a subcommittee which * * * was to conduct specific hearings, and among other matters which they would discuss would be the question of whether certain witnesses should be taken in executive session or be put in a public session. * * * The whole hearings had been projected as public hearings, [but] discussion was had * * * on the basis of my representations to the Committee respecting * * * whether particular witnesses should or should not be taken in the public sessions as distinct from the executive session." (S-Tr. 49–50.)

Mr. Arens had earlier described the nature of his discussions with Congressman Walter over possible continuances or possible executive sessions for witnesses in forthcoming hearings:

"What happened, in the continuances of these cases, we would get the subpoenas out pursuant to the direction of the Chairman all set to go. I would be with the Chairman and I would say, now, Mr. Chairman, do you want any continuances? He would say, No. I would say, do you want any more executive sessions if they come in? He would say, No. I would ask him a number of things—Do you want television? No. Do you want this? No. He would make those decisions. Then I would, on his behalf, and on behalf of the Committee, follow through. And that happened in this case and

was said to be June 10, 1957. (S-Tr. 47–8.) However, in the opening statement of the subcommittee chairman, Congressman Doyle, at the commencement of the hearings themselves, the date was referred to as July 10, 1957. Hearings, supra, 1377. The Court has adopted the latter date, since Congressman Doyle made his statement only ten days later, on July 17, 1957, and the executive session would then have been fresh in his

it happened in the Yellin case and it happened in all of these cases." (S-Tr. 41.)

■ The present record not only requires this Court to follow the result in the Yellin case, but also describes in even greater detail the kinds of loose procedures utilized by the House Un-American Activities Committee in determining whether a witness would be called in public or in executive session. A general decision to hold hearings in public; a recommendation, virtually amounting to a decision, by the Staff Director as to whether a particular witness should be called in public or in executive session; a quick "no" from the Chairman when asked if any future, specific requests for executive session should be granted; and a denial by the Staff Director of a specific request without consulting any members of the Committee—these procedures do not comply with the fair standards contained in the Committee's own Rule IV.

■■ For Rule IV requires, as the Supreme Court in Yellin made clear, that the Committee itself exercise a reasoned judgment based upon the standards specifically set forth—including a consideration of possible injury to the witness' own reputation. In exercising this reasoned judgment, the Committee obviously has a wide area of discretion, Yellin, 374 U.S. at 117–118, 83 S.Ct. at 1833–1834, 10 L.Ed.2d 778; but before that discretion comes into play at all, there must be thought and consideration—in short, a decision by the Committee itself. In the present case, since there was no Committee decision at all in response to a specific request for an executive session, the discretion was never exercised.[4]

memory. In any event, the difference is immaterial for the purposes of the present cases.

4. This Court expresses no opinion on whether consideration by the full Committee, or the full subcommittee, or the Committee Chairman, or the subcommittee chairman is required under Rule IV. The Court has merely followed the Yellin case in holding that consideration by the Staff Director alone is not sufficient.

In view of the foregoing, a finding of not guilty will be entered in the case against Silber, pursuant to Rule 23(c), Federal Rules of Criminal Procedure.

### The Grumman Case.

The Grumman case differs from the Silber case in that neither Grumman nor his attorney made any specific request for an executive session. This fact requires the Court to decide a question which it did not have to reach in the Silber case—namely, whether the Committee adequately followed Rule IV's command that in deciding whether to hold a public or an executive session, three factors must be considered: possible injury to the national security, possible unjust injury to the reputations of others, and possible unjust injury to the reputation of the witness himself. Rule IV, A(1), supra.

This Court has concluded, on the basis of the testimony of Mr. Arens, that the Committee failed adequately to take into consideration possible injury to the reputation of the witness Grumman in deciding whether or not to call Grumman in public or executive session. Since precisely such a failure was the other ground for the Supreme Court's holding in the Yellin case, supra, this Court is required to enter judgment of acquittal in the case against Grumman, just as it was required to do in the case against Silber.[5]

In Yellin, the Supreme Court held that under Rule IV, the Committee must consider the three factors—including possible unjust injury to the reputation of the witness himself—before making the initial decision on whether the witness shall appear in public or in executive session. If "the initial Committee decision to question [a witness] publicly, * * * was made without following Rule IV," 374 U.S. at 119, 83 S.Ct. at 1835, 10 L.Ed.2d 778, then the witness

cannot later be convicted of contempt of Congress for failing to answer a question at public interrogation. Yellin, supra.

Mr. Arens, Staff Director of the Committee at the time defendant Grumman was subpoenaed and interrogated at a public hearing, testified before this Court as follows about the general practice of the Committee and its staff in applying the three criteria of Rule IV:

"In explaining the practice it would be desirable to perhaps distinguish what we loosely call 'friendly' witnesses and what we loosely call 'hostile' witnesses and the applicability of the rule to each instance. * * *

"Just for the purposes of staff operations, we regard it as a 'friendly' witness, or characterize it as a 'friendly' witness * * * if that witness gave evidence of his intent to testify fully and freely without any reservations.

"On the other hand, if we concluded on the basis of investigative techniques, that witness would not testify fully and freely on matters that we hoped to interrogate him on, we would characterize him just staff-wise, as an 'unfriendly' witness.

"With that background, I think I could probably give a little more clarification of the way in which this rule was implemented in practice. * * *

"In connection, first of all, with what we would regard as a 'friendly' witness, we would almost invariably interrogate the 'friendly' witness in detail in what might be loosely called an executive session, or a session in which the press or public is not admissible, for the purpose of being certain that the witness did not make any loose statements which

---

5. If the Court had been required to reach this issue in the Silber case, the decision would have been the same as in the Grumman case—particularly since the testimony of Mr. Arens was stipulated

to be equally admissible in both cases to the extent that such testimony was relevant or material to any issue in either case.

would unjustly injure the reputation of anyone else, and also that his statements would not be a disclosure, constitute a disclosure, of information which would be of a nature that would endanger the national security, a revelation of secret or semi-secret information. That is the general pattern with respect to what we characterized as 'friendly' witnesses.

"With reference to the other category, the 'unfriendly' witnesses, we would take in executive session, or a closed session first, a witness on whom the identification by a so-called 'friendly' witness was not as firm or solid as we thought it should be before we could risk the prospect of endangering the integrity or reputation of an 'unfriendly' witness. Also, if we had reason to believe that the so-called 'unfriendly' witness might be a 'friendly' witness, and might disclose information rather than to refrain from doing so, we would frequently take the witness that we thought might be 'unfriendly' in executive session, hoping that he would disclose information to us." (G-Tr. 6–8.)

When asked whether there was any Committee practice with respect to persons whose reputations might be unjustly hurt in public session but who the staff felt would make no disclosures whatever in executive session, Mr. Arens replied:

"Yes. The practice in those instances, if we felt they would not be unjustly hurt, or their reputations unjustly damaged, and if the identification of the particular witness was what we loosely would call a solid identification, identification which was absolute, and which in many instances would be confirmed from other sources, we would then take that witness in public session." (G-Tr. 10.)

When asked if he meant that if a witness was "one who might himself be hurt merely by being called and questioned,

he would be called in open session if the evidence against him was what you said would be 'solid,'" Mr. Arens replied: "That's right, absolute or solid; yes." (G–Tr. 10.) Mr. Arens then gave an example of what information might be considered "solid":

"First of all, we would consider the integrity and reliability of the so-called identifying or 'friendly' witness. If he were a man, and I am using hypothetical cases, who had been an FBI undercover agent, and had the confidence of the FBI and with whom we had repeated interviews and checked out other things that he had told us, just our own appraisal of him as a witness, as a court would have a witness testifying in a court as to his veracity, and the like, that in and of itself would, in most instances, satisfy our feeling as to the validity of his identifications.

"If we had any question in our mind that he may have been mistaken, or that there may have been some question as to his integrity, or that he might be motivated by improper designs, or something of that kind, we would make every effort to verify what his identification would be from other sources, and then we would have to use an evaluation of the facts." (G–Tr. 10–10a.)

Mr. Arens was then asked who made the final determination as to whether there should be an executive session, the staff, the Committee chairman, or the Committee. Mr. Arens replied:

"I would have to say that there was no series of rules implementing this rule here, guidelines. It was a practice and pattern of operation. The staff would, in the first instance, recognizing the basic approach that the Committee makes, would suggest to the Committee that in this hearing we will have so-and-so witnesses, whom we think should be heard in public session. Implicit in that recommendation is a conclusion that

was arrived at in the staff's mind that all of these other elements had been properly met and evaluated." (G–Tr. 10a–11.)

Mr. Arens then described what would happen after the staff had arrived at a conclusion that "Mr. Brown" would be taken in executive session, and "Mr. Smith" would be taken in public session:

"I would be in constant consultation with the Chairman who would be discussing the various witnesses and various phases of the investigation, and I would say 'Brown,' 'Smith,' and 'Jones' have been solidly identified by an undercover agent of the FBI, and we confirmed this from our other sources, and therefore, we propose they be taken in public session. We would say we feel shaky on 'Johnson'—and these, of course, are only names I am pulling out of the air—anyway, we would be shaky about someone's identification, or we would be unjust to take a certain person in public session first, and we would just tell the Chairman.

"Now, frequently he would just accept our recommendation without going behind it, because he knew that I was thoroughly cognizant of the views and attitudes of the Committee. I didn't mean to imply here that in every case I would discuss in great detail the reasons why we recommended public sessions, or executive session, but on some occasions, it would be very rare, one or two, the Committee would think differently from the staff, and, of course, the Committee's view would prevail." (G–Tr. 11–12).

Later, Mr. Arens testified further on the procedure used by the staff in deciding initially whether a prospective witness would fall into the "friendly" or "unfriendly" category:

"As a matter of practice, we would have, say, in the 'friendly,' or cooperative, witness, an individual who had been interviewed extensive-

ly by the investigators and on the basis of their report to me, and by me to the Committee, determination would be made that this witness here is a cooperative witness—he is ready, willing, and able to testify and has valuable information, and we have checked out his character, reputation and background, and we are confident he is qualified to meet all these criteria which I just recited." (S–Tr. 4–5)

Mr. Arens continued that where the staff had not interviewed the witness beforehand, several criteria would be used to decide in advance whether the witness was likely to be "unfriendly":

"One would be on the basis of what we were told about that witness, by the man who had information concerning the so-called cooperative witness. That would be one criterion.

"Another criterion would be the information that we had in the files of the Committee. You must bear in mind that you are dealing here with a Committee that has developed over the course of a quarter of a century expertise in dealing with the Communist conspiracy.

"Still another, which is only slightly confirmatory but is one element we sometimes considered, and that is actually the lawyers that represented the Communists, because we knew Communist lawyers and we knew the pattern * * *. We knew who were Communist lawyers, who were members of the Communist conspiracy who were in the legal profession and we had developed certain expertise in coping with them and we knew by confidential sources the directives that would come to these Communist lawyers. If we see a man enmeshed with a Communist lawyer, that would be not decisive, by any means, but another thing that we would take into consideration to determine whether or not we could anticipate that the

man would be in the so-called 'friendly' or 'unfriendly' category.

"There were other devices and techniques which were used, some of which were of a confidential nature." (S–Tr. 5–6.)

Mr. Arens testified that he had no independent recollection of whether the procedures and criteria just outlined were followed in deciding whether to call defendant Grumman in executive or in public session, but since the practice he described was "an invariable" one, he said he was "confident" that there was no departure in the case of Grumman. (G–Tr. 14–15.)

This Court has concluded that the application of Rule IV, as outlined in the above testimony of Mr. Arens, violates the language and purpose of Rule IV itself, and conflicts with one of the basic limitations which Congressional committees must observe in conducting investigations. There is absolutely no basis in Rule IV for distinguishing between "friendly" and "unfriendly" witnesses. Regardless of which category a particular witness might be thought to fall into, that witness is entitled to the protection of Rule IV, which states in clear terms that the Committee must consider possible danger to the national security, and possible unjust injury to the witness' reputation or to the reputations of other individuals.

The issue clearly must be phrased in terms of what Rule IV means by "unjust" injury.

According to the Committee's interpretation, as described by Mr. Arens, there can be no unjust injury where a witness who is expected to be uncooperative and who has been reliably identified as a member of the Communist Party is interrogated publicly about his supposed Communist connections. The only instance of an "unjust" injury, in Mr. Arens' view, occurs if a witness were to be *erroneously* identified as a Communist in public.

██ This interpretation of Rule IV ignores the delicate balancing of public against individual interests which the word "unjust" requires the Committee to make in determining whether to call a witness in public or in executive session. Traditionally, courts in reviewing contempt of Congress cases must undertake such balancing in evaluating the propriety and pertinancy of questions asked of a witness. Barenblatt v. United States, 360 U.S. 109, 126, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); United States v. Peck, 154 F.Supp. 603, 607 (D.C.D.C. 1957). Rule IV imposes a similar obligation upon the Committee in reaching its decision of whether to ask its questions in public or in private. The apparent truthfulness or "solidity" of the identification of the witness as a Communist is only one of several factors to be weighed in the scales on the side of the interests of the particular individual. Another factor is the possible remoteness in time of the alleged Communist connections which the Committee wishes to expose—even if those connections are assumed to be true. Against such factors on the side of the individual, there must be weighed on the side of the public the amount of valuable information the Committee expects to gain. See Peck, supra, 154 F.Supp. at 607.

It is clear, however, that Mr. Arens' interpretation of Rule IV does not provide for this kind of delicate and particularistic balancing, as the word "unjust" requires. Indeed, Mr. Arens' interpretation blatantly reveals the real purpose of the Committee in calling in public session a witness who has already been labelled "unfriendly"—namely, exposure for the sake of exposure. For according to the Committee's own definition, an "unfriendly" witness is one who has already been "solidly" identified and who is expected to divulge nothing. Thus by the Committee's interpretation, no new information will be gained in the public session, and the Committee is merely engaged in exposing to public view the past associations of the witness. The Supreme Court has castigated such exposure in clear and binding terms:

"The power of the Congress to conduct investigations is inherent in the legislative process. That power

is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste. But, broad as is this power of inquiry, it is not unlimited. There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress. \* \* Nor is the Congress a law enforcement or trial agency. These are functions of the executive and judicial departments of government. No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." Watkins v. United States, 354 U.S. 178, 187, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273 (1957).

"We have no doubt that there is no congressional power to expose for the sake of exposure. The public is, of course, entitled to be informed concerning the workings of its government. That cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private rights of individuals. \* \* \* The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose. Their function is to act as the eyes and ears of the Congress in obtaining facts upon which the full legislature can act."

354 U.S. at 200, 77 S.Ct. at 1185–1186, 1 L.Ed.2d 1273.

In this language from the Watkins case, the Supreme Court has declared that Congress has no power, under our Constitution, to expose for the sake of exposure. Yet precisely such forbidden exposure for the sake of exposure is the clear result of this Committee's interpretation of its own Rule IV: since no new information is expected from a so-called "unfriendly" witness, the sole remaining purpose of public interrogation is to create public scorn. Revealing the truth in public, even in regard to an uncooperative witness, may of course sometimes be appropriate. But it is not automatically appropriate: it is the Committee's task, in applying its own standard of "unjust injury," to exercise a delicate balancing of judgment, weighing legitimate private interests against legitimate public interests.[6]

The Committee's discretion in this regard is thus limited by standards of fundamental procedural fairness implied in the word "unjust." As one commentator has recently observed in discussing limitations imposed upon Congressional investigations:

"It is I think correct to suggest that \* \* \* the vague but fertile notions of fairness, of respect for the dignity of an individual confronted with governmental power, of notice, and of regularity \* \* \* [provide] a goal, a point of reference properly and traditionally within the competence of a court's discretionary and particularistic judgment. For even should it not be possible conscientiously to conclude that the power of Congress here may be limited in principle, the court may very well insist that its own processes not be invoked—as they inevitably are in criminal proceedings—unless the exercise of governmental

---

6. But cf.: "Publicly interrogating a witness if the Committee's foundation for its questions rests only upon suspicion or rumor falls within the area of unjust injury to reputation. But public revelation of the truth does not." White, J., dissenting in Yellin, supra, 374 U.S. at 145, 83 S.Ct. at 1848, 10 L.Ed.2d 778.

power which is being vindicated comports in form and style (whatever its content) with these procedural notions of fairness and decorum." Fried, "Two Concepts of Interests: Some Reflections on the Supreme Court's Balancing Test," 76 Harv.L.Rev. 755, 776 (1963).

 In Rule IV, of course, we have a standard of fairness adopted by the Committee itself and not imposed by the courts, which suggests even more strongly the proposition that the failure of the Committee properly to apply its own Rule IV requires a court to enter judgment of acquittal in any subsequent prosecution for contempt of Congress. Yellin, supra. Rule IV exists as a self-imposed reminder to the Committee that in deciding whether to call a witness for public interrogation, competing public and private interests must be carefully weighed in order that the reputation of the prospective witness or of other persons not be unjustly damaged, and in order that the national security not be endangered. Such careful balancing is conspicuously absent in the procedures described by Mr. Arens in testimony before this Court.

Complete disregard of such balancing is shown by the facts surrounding the decision to call defendant Grumman in public, rather than in executive, session.

The record shows that Grumman had filed non-Communist affidavits with the National Labor Relations Board beginning with September 1, 1949, and continuing through and after his appearance before the Committee in July of 1957. In these affidavits the defendant swore under oath and subject to the penalties for perjury that he was not a member of the Communist Party or affiliated therewith and that he did not believe in and was not a member or supporter of any organization which advocated the overthrow of the Constitution of the United States by any illegal method. The record also shows that prior to calling Grumman as a witness, the Committee had knowledge that he had filed such affidavits.

The record also shows that Grumman was called as a witness because the Committee had information which it considered to be completely reliable and trustworthy from a previous witness to the effect that Grumman had been a member of the Communist Party sometime in the period between 1936 and 1940. This is the same issue of remoteness which this Court considered seven years ago, where a defendant before a Congressional committee had been

"asked to identify persons who belonged to groups at a time when those groups constituted legitimate political associations and when many Americans who would have violently opposed the overthrow of the government by force were members. These questions related to periods which were remote in time and in which a different political climate prevailed. There had not yet occurred any armed conflict between American and Communist armies. * * * There is little, if any, national interest to be served by engaging in so indiscriminate a resurrection of the political past—and whatever interest there is, is more than counterbalanced by the deprivation of First Amendment rights." United States v. Peck, D.C., 154 F. Supp. 603, 607 (1957).

In addition to the above knowledge about Grumman's past—both recent and remote—the Committee had already concluded that Grumman would be an "unfriendly" witness. (G–Tr. 55.)

██ Thus the Committee could hope to gain nothing from interrogating Grumman except exposing to public view the accusation that he had been a member of the Communist Party in the relatively remote past sometime between 1936 and 1940. If the Committee had applied Rule IV with a proper awareness of what constitutes an "unjust" injury to reputation, and without relying upon the extraneous distinction between "friendly" and "unfriendly" witnesses (which distinction is not found in Rule

**240**

·IV), the Committee could not have called Grumman in public session, especially in view of the remoteness of the period during which Grumman was charged with having been a member of the Communist Party. For the Committee to call Grumman in public was thus a violation of its own rules of procedure.

 In view of the foregoing, a finding of not guilty will be entered in the case against Grumman, pursuant to Rule 23(c), Federal Rules of Criminal Procedure.[7]

7. The Government has moved this Court to stay its findings in these cases pending disposition "of any possible appellate procedures" in the case of Shelton v. United States, decided recently by a panel of our Court of Appeals. D.C.Cir. 1963, 327 F.2d 601. The Government is apparently considering petitioning for an *en banc* hearing before the Court of Appeals, or for *certiorari* before the Supreme Court. However, since this Court has reached its conclusions in the present cases entirely aside from the Shelton case, and since that case involved a different committee (the Senate Internal Security Subcommittee) operating under different rules, and presented a different issue (whether the authority to issue a subpoena rests with a subcommittee and not with its chairman alone), the Government's motion will be denied.